# In re J-B-N- & S-M-, Respondents

*Decided June 25, 2007*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

   Under section 101(a)(3) of the REAL ID Act of 2005, Div. B of Pub. L. No. 109-13, 119 Stat. 302, 303, in mixed motive asylum cases, an applicant must prove that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for the claimed persecution.

FOR RESPONDENTS:  Elissa Steglich, Esquire, Newark, New Jersey

BEFORE:  Board Panel:  HOLMES, GRANT, and MILLER, Board Members.

HOLMES, Board Member:


   In a decision dated January 4, 2007, an Immigration Judge denied the respondents' applications for asylum, withholding of removal, and protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46. 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture").  The respondents have appealed from that decision.  The appeal will be dismissed.

## I.  FACTUAL AND PROCEDURAL HISTORY

   The respondents are a married couple who are natives of Burundi and citizens of Rwanda.  The record reflects that they sought entry to the United States on September 11, 2006, but were placed in removal proceedings because they did not have valid visas.  On the basis of their own admissions, the Immigration Judge found that they were removable.  She further denied their applications for asylum and withholding of removal based on a finding that the respondents' claimed fear of persecution did not have a nexus to one of the five protected grounds specified in section 208(b) of the Immigration and Nationality Act, 8 U.S.C. § 1158 (2000).  Specifically, the Immigration Judge found that the respondents' claim did not meet the new standard

provided in section 101(a)(3) of the REAL ID Act of 2005, Div. B of Pub. L. No. 109-13, 119 Stat. 302, 303 ("REAL ID Act"), which requires an asylum applicant to prove that a protected ground is "at least one central reason" for the fear of persecution.[1]  On appeal, the respondents argue that they produced adequate evidence to show that the persecutors were motivated to harm them because of their "imputed Burundian nationality and membership in the particular social group of old case-load refugees."[2]

## II.  ANALYSIS

### A.  Credibility

Despite some inconsistencies between the lead respondent's[3] story and documentary evidence detailing a "land dispute," the Immigration Judge noted that his testimony was consistent with his asylum application.   The Immigration Judge did not enter an explicit credibility determination on the respondents' claim as a whole.  As a result, we will treat both respondents' testimony as true for purposes of this appeal.[4]

### B.  Respondents' Claim

According to the respondents' testimony, they lived in Burundi until 1996, when they went to live in Rwanda around the time of their marriage.  Both are Tutsi by ethnicity.  The respondent testified that shortly after his arrival in Rwanda, he became close to an uncle who deeded a parcel of land to him so that he could build a home.  The respondents apparently could not afford to build the home until 2004.

---

[1] The REAL ID Act amended the burden of proof standard for asylum applications under the Act.  This amendment was enacted on May 11, 2005, and was expressly made applicable to asylum applications, like those of  the respondents, that were filed on or after that date. *See* REAL ID Act § 101(h)(2), 119 Stat. at 305.

[2] The respondents' claim is framed as relating to their "imputed Burundian nationality" because, although both were born in that country, they are citizens of Rwanda through their parents, who fled to Burundi to escape violence in Rwanda in the 1950s.  Returnees to Rwanda from Burundi and other countries are referred to as "repatriated refugees" and are sometimes classified as having the nationality of the country they came from, e.g., "Burundian," "Ugandan," or "Congolese."

[3]  The male respondent is the lead respondent in this case.  Any further mention of the respondent in the singular refers to him.

[4] *See* REAL ID Act § 101(a)(3), 119 Stat. at 303 (to be codified at section 208(b)(1)(B)(iii) of the Act).

After the respondent's uncle died in 2002 and the respondents started to build on the property, the aunt took over the land to prevent the respondents from developing the property. The respondent's aunt told him that this was because he was not a member of the extended "Sengabo" family. The respondent filed a complaint to "repossess" the land. After some legal proceedings, the district ruled that the respondents had a right to the property in January 2005.

In March 2005, the respondent began to receive anonymous telephone calls telling him to return to Burundi. These calls lasted until June 2006. The respondent indicated that he recognized the voice of his cousin, who was a major in the national police. He testified that his cousin also came to his home three times, once in April 2006 and twice in May or June of that year. The respondent decided to leave Rwanda in June 2006 and secured visas for himself and his wife through the American Embassy, where he worked as a driver. Upon arrival in the United States, the respondents were told that their visas had been canceled. The respondent believes that his aunt and her family members were responsible for this. He stated that he thought that his relatives were hostile to him because he "came from abroad [and] they did not know [him]." The respondent indicated that he believed that the aunt and cousin feared he would "take the goods of dead family members. For them, it was unbearable." On cross-examination, the respondent admitted that he and his aunt had an uneventful relationship prior to the land dispute. He described this relationship as a "friendship" prior to the dispute.

The female respondent's testimony was in substantial agreement with this version of the events. She testified that she was present in April 2006 when the respondent's cousin came to her home with three others in police uniforms. The cousin told her to tell the respondent that it would be better for him to return to Burundi. Next, in early May 2006, the cousin came again with men in police uniforms, searched the home, and found passports with the visas in them. Toward the end of the month he came a third time and threatened her if the couple did not leave. On cross-examination, the female respondent agreed with her husband that prior to 2004, when they began to build on the land, there were no problems with his aunt or cousins. In fact, the female respondent stated that aside from the land issue, there "was no other problem. They started only when the land problem started."

The respondents presented the testimony of a witness who is a professor of political science and Africana studies and a researcher on the country of Rwanda. The witness stated that Rwandans like the respondents, who were returning from Burundi, would have very low social status. He testified that the land in dispute between the respondent and his aunt was very valuable, "like owning property in downtown Manhattan." The witness characterized

land disputes in Rwanda as common and indicated his opinion that the aunt was trying to make a profit by selling the land. The witness further stated that even though the respondent had received a judicial decree that confirmed his ownership rights, he was essentially out of luck when it came to enforcing his decree, because he had little power in Rwanda relative to that of his aunt and her family. According to the witness, the cousin's position as a police officer was "very significant" because it allowed him to oppose the respondents' attempt to keep the land. The witness concluded that the respondents' risk of harm in Rwanda stems from a "family squabble" and the fact that being from Burundi, they "don't have connections to power that they could turn to for protection."

## C. Statutory and Case Law

Prior to its amendment by the REAL ID Act, the Immigration and Nationality Act provided that an applicant could demonstrate eligibility for asylum by showing that he or she was a "refugee," as that term is defined in section 101(a)(42) of the Act, 8 U.S.C. § 1101(a)(42) (2000). Pursuant to that definition, an alien is required to demonstrate that he is unwilling or unable to return to his country because of persecution, or a well-founded fear of persecution, on account of race, religion, nationality, membership in a particular social group, or political opinion. *Id.*; *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987).

Although an alien must fully demonstrate that he meets the requirements of the refugee definition, we have stated that "an applicant does not bear the unreasonable burden of establishing the exact motivation of a 'persecutor' where different reasons for actions are possible." *Matter of Fuentes*, 19 I&N Dec. 658, 662 (BIA 1988). Recognizing that "[p]ersecutors may have differing motives for engaging in acts of persecution," we have indicated that an applicant for asylum need not show "conclusively" that the persecution was, in fact, motivated on account of one of the five grounds protected under the Act. *Matter of S-P-*, 21 I&N Dec. 486, 489 (BIA 1996).[5] Rather, we have stated that an applicant must produce evidence, either direct or circumstantial, from which it is reasonable to believe that the harm was or would be motivated in part by an actual or imputed protected ground. *Id.* at 494.

---

[5] In fact, we stated that such a requirement would render "nugatory" the Supreme Court's decision in *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987). *Matter of S-P-*, *supra*, at 489.

## D. REAL ID Act Amendments

In enacting the REAL ID Act, Congress sought to clarify the above standard and to provide a "uniform standard for assessing motivation." *See* H.R. Rep. No. 109-72, at 163 (2005) (Conf. Rep.). The statute now states that an asylum applicant must "establish that race, religion, nationality, membership in a particular social group, or political opinion *was or will be at least one central reason* for persecuting the applicant." REAL ID Act § 101(a)(3), 119 Stat. at 303 (to be codified at section 208(b)(1)(B)(i) of the Act) (emphasis added). This case requires us to assess the new statutory standard and to determine what evidence satisfies an alien's burden of showing that at least one central reason for his or her mistreatment "is on account of race, religion, nationality, membership in a particular social group, or political opinion." *See* H.R. Rep. No. 109-72, at 165.

Our interpretation of the law is governed by settled principles of statutory construction. First, we must look to the actual language used in the statute. It is well settled that the "'starting point must be the language employed by Congress'" and that we must assume "'that the legislative purpose is expressed by the ordinary meaning of the words used.'" *INS v. Phinpathya*, 464 U.S. 183, 189 (1984) (*quoting American Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982)); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987); *Matter of Ruiz-Romero*, 22 I&N Dec. 486 (BIA 1999). Second, we must look to the language and design of the statute as a whole. *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). Third, we must give effect, if possible, to all parts of a statute. *Kungys v. United States*, 485 U.S. 759 (1988).

The definition of the word "central" includes "[h]aving *dominant* power, influence, or control." *Webster's II New College Dictionary* 181 (1st ed. 1995) (emphasis added). Recognizing that this definition could pose problems for those seeking asylum based on "mixed motives,"[6] Congress purposely did not require that the protected ground be *the* central reason for the actions of the persecutors.[7] Rather, the version of the REAL ID Act originally introduced in the House of Representatives provided that an asylum applicant would bear the burden of proving that one of the five protected grounds "was or will be *a*

---

[6] The problem in classifying one motive as "dominant" or "central" is that it renders all other motives, regardless of their significance to the case, secondary and therefore ultimately irrelevant.

[7] One commentator has suggested that the use of the word "central" could create the "opportunity for adjudicators to require more proof of causation" than that previously set forth in *INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992), and *Matter of S-P-*, *supra*. *See* Marisa Silenzi Cianciarulo, *Terrorism and Asylum Seekers*: *Why the REAL ID Act is a False Promise*, 43 Harv. J. on Legis. 101, 118 (Winter 2006).

central reason for persecuting the applicant." *See* H.R. 418, 109th Cong. § 101(a)(3) (2005) (emphasis added). During conference on the bill, this language was modified to become "at least one central reason," the final version of the REAL ID Act.[8] That language thus confirms that aliens whose persecutors were motivated by more than one reason continue to be protected under section 208 of the Act if they can show a nexus to a protected ground.

Along with giving effect to the ordinary meaning of a provision's words, a fundamental guide to statutory interpretation is "common sense." *Matter of N-B-*, 22 I&N Dec. 590 (BIA 1999) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1994)). In exercising our common sense to ascertain the meaning of the statutory amendments at issue, "we construe the language in harmony with the wording and design of the statute as a whole." *Matter of Fuentes-Campos*, 21 I&N Dec. 905, 907 (BIA 1997) (citing *K Mart Corp. v. Cartier, Inc.*, *supra*, at 291). In this regard, we look to the legislative history behind the amendments to the Act and note that Congress stated in the conference report on the approved bill that in asylum claims under the amended Act, the protected ground cannot be merely "'incidental or tangential to the persecutor's motivation.'" *See* H.R. Rep. No. 109-72, at 163 (quoting Asylum and Withholding Definitions, 65 Fed. Reg. 76,588, 76,592 (Dec. 7, 2000)). "Incidental" is defined as "[o]f a minor, casual, or subordinate nature," reflecting the conferees' intent that where a protected ground is only subordinate to another (nonprotected) reason for the persecution, an applicant is ineligible for asylum. *See Webster's II New College Dictionary*, *supra*, *at* 560. Similarly, because "tangential" is defined as "[s]uperficially relevant," a claimant who raises a protected ground as only a superficial part of the overall claim will likewise be ineligible for asylum. *Id.* at 1126.

We also note that Congress cited with approval two federal cases assessing "mixed motive" situations. *See* H.R. Rep. No. 109-72, at 163. In *Girma v. INS*, 283 F.3d 664 (5th Cir. 2002), the United States Court of Appeals for the Fifth Circuit denied relief where an Ethiopian woman who had been abducted and attacked presented inadequate evidence of who attacked her and why. Key to this finding was the fact that the applicant offered no proof to show whether those who attacked her did so because of her political affiliation or simply to extort money from a wealthy businesswoman. *Id.* at 667. The court stated that the alien was required to show that harm was "motivated in meaningful part" by a protected ground. *Id.* at 668. In *Ambartsoumian v. Ashcroft*, 388 F.3d 85 (3d Cir. 2004), the Third Circuit denied asylum to a married couple who claimed in part that they were persecuted because the

---

[8] The REAL ID Act language was incorporated into H.R. 1268, 109th Cong. (2005).

husband was not a native Ukrainian. The court found that the record supported a finding that the male respondent's "troubles . . . stemmed not from his ethnicity but from his lack of official permission to live and work [in Ukraine.]" *Id.* at 91 (also noting "several reasons" why the male respondent was unable to get a job in Ukraine, including his inability to speak the native language).

Having considered the conference report and the language of the REAL ID Act, we find that our standard in mixed motive cases has not been radically altered by the amendments.[9] The prior case law requiring the applicant to present direct or circumstantial evidence of a motive that is protected under the Act still stands. As had previously been the case, the protected ground cannot play a minor role in the alien's past mistreatment or fears of future mistreatment. That is, it cannot be incidental, tangential, superficial, or subordinate to another reason for harm. Rather, it must be a central reason for persecuting the respondent. The motivation of the persecutors involves questions of fact, and the burden can be met by testimonial evidence. *Matter of S-P-*, *supra*, at 490. Supporting documents and corroborative background evidence also "must be taken into account." *Id.*

---

[9] The amendment clarifying the standard that an applicant must meet to establish the motivation for the claimed persecution appears more directed to judicial case law. The REAL ID Act conferees noted that there was no uniform standard for assessing motivation and indicated that the adoption of the "at least one central reason" standard would significantly impact the approach taken by the Ninth Circuit in some mixed motive cases. *See* H.R. Rep. No. 109-72, at 163. The report reflects that the new statutory standard addresses the Ninth Circuit's decisions in *Borja v. INS*, 175 F.3d 732 (9th Cir. 1999), *Briones v. INS*, 175 F.3d 727 (9th Cir. 1999), and other cases, which had "substantially undermined a proper analysis of mixed motive cases." H.R. Rep. No. 109-72, at 163. The conferees also stated that the new standard would address an anomaly in the law created by the Ninth Circuit "that improperly favors asylum applicants who claim that they have been accused of engaging in terrorist, militant, or guerrilla activity" by creating a presumption in certain circumstances that certain government prosecutions were politically motivated. *Id.*; *see also, e.g.*, *Singh v. Ilchert*, 63 F.3d 1501, 1509 (9th Cir. 1995); *Blanco-Lopez v. INS*, 858 F.2d 531, 534 (9th Cir. 1988); *Hernandez-Ortiz v. INS*, 777 F.2d 509, 516 (9th Cir. 1985). The report states that the "central reason" standard "will eliminate this presumption, and require aliens who allege persecution because they have been erroneously identified as terrorists to bear the same burden as all other asylum applicants, that is, they will have to offer direct or circumstantial evidence of motive, in accordance with Supreme Court precedent." H.R. Rep. No. 109-72, at 165. The issues addressed in this regard do not arise in the case before us.

### E. Application of the REAL ID Act to Respondents' Claim

The Immigration Judge dismissed the respondents' claim because she found that they had failed to produce evidence to show that a protected ground was at least one central reason for the mistreatment and threats by his aunt and cousin. She found no evidence of past persecution, summarizing the case as "a family dispute." In support of this conclusion, the Immigration Judge noted the lack of any direct or circumstantial evidence that the family members targeted the respondents because they came from Burundi, finding instead that they wanted to "dispossess the respondent of the land . . . and thereafter attempt[] to sell [it] for an exorbitant amount of money." The Immigration Judge also found that the respondents' cousins did not try to harm them because they wanted to "politicize" the land dispute, noting the lack of any persuasive evidence to corroborate this claim. Finally, the Immigration Judge found the testimony of the expert witness to be "not at all helpful" on the issue of motive, because he provided testimony that was beyond the scope of the respondents' claim.

We are not persuaded that the Immigration Judge's relevant fact-finding in this regard was clearly erroneous, and we otherwise agree with her analysis. *See* 8 C.F.R. § 1003.1(d)(3)(i) (2007). Because there has been no showing of past persecution, we examine whether the respondents have established a well-founded fear of persecution on account of a protected ground. The balance of the evidence indicates that the respondents were targeted because of a fight over the land, not because they were born in Burundi. The respondents admitted that prior to their decision to build on the land, there were no problems with either their aunt or their cousins. There is no evidence of threats or taunts on account of their imputed Burundian nationality before the land dispute. In fact, the female respondent stated that there were no problems between her husband and his relatives before he started developing the land deeded by his uncle, and the respondent admitted that prior to the land dispute, he had a relatively cordial relationship with his aunt.

Even though the Immigration Judge largely disregarded it, we note that the opinion of the expert witness–in the context of the record as a whole–also confirms the conclusion of the Immigration Judge, in that he observed that "Rwanda has a long tradition of family violence, which is common and often extreme." Furthermore, the background evidence confirms that Rwanda itself "identified land as ranking highest among potential sources of conflict" between its citizens. African Peer Review Mechanism, *Country Review Report of the Republic of Rwanda* § 6.1.2, at 126 (June 2006) (discussing Rwanda's "Country Self-Assessment Report"). This indicates that it would be common to find land access issues at the center of a potentially violent family dispute.

Moreover, even if we accept the expert witness's testimony that the respondents' status as outsiders from Burundi meant that they did not have access to institutions that they could turn to for help, we still find that this claim is fundamentally a personal dispute, not one that is on account of the respondents' imputed nationality. The respondents were two of millions of repatriated refugees whose numbers overwhelmed the Rwandan Government, which had not planned for the space and resource needs of these returnees. The respondents' lack of connections to power occurred because they previously lived in Burundi and therefore had not been in Rwanda long enough to establish ties or connections that could rival those established by his aunt. This disenfranchisement may have prevented them from enforcing their property rights decree, but it does not equate to proof that they were targeted by family members because of their nationality. *See Ambartsoumian v. Ashcroft*, *supra*, at 91 (finding that the inability of the respondent, a native Georgian, to get a work permit and residence in Ukraine was not persecution on account of his ethnicity where the record reflected that the respondent did not follow steps to secure work and residency permits and could not speak Ukrainian).

Finally, the record lacks evidence to support a finding that the respondents' absence from Rwanda during the genocide there resulted in their persecution by relatives on account of an imputed political opinion. While the expert witness discussed various divisions among the population in Rwanda, including those who were in the country during the genocide and those who were not, the record contains no evidence, direct or circumstantial, that would enable us to conclude that the respondents were targeted on account of an actual or imputed political opinion.

## III. CONCLUSION

Without evidence that the respondents' Burundian origins or their status as repatriated refugees was more than a tangential motivation for the threats against them, we cannot find, as the Act requires, that a protected ground was "at least one central reason" for the respondents' fear of harm. Here, the fact that the respondents were born in Burundi and then came to live in Rwanda can best be described as incidental to the central land dispute. The record reflects no direct or circumstantial evidence that would tend to show that the respondents' aunt and cousins were interested in harming them because they came from Burundi. Indeed, the evidence shows that absent the land dispute, the respondents would have had no conflict with family members in Rwanda. The respondents therefore cannot qualify for the relief of asylum or withholding of removal.

The respondents also have not shown a clear probability of torture at the instigation of, or with the consent or acquiescence of, current government

officials or persons acting in an official capacity.  A public official's acquiescence to torture "requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7) (2007).  The respondents have not shown that anyone in the Rwandan Government would affirmatively consent or acquiesce to their torture.  They are therefore not entitled to protection under the Convention Against Torture.

Accordingly, the respondents' appeal will be dismissed.

**ORDER:**  The appeal is dismissed.