In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1111

HAFSA SHAIKH and
ASIM SHAIKH,

*Petitioners,*

*v.*

ERIC H. HOLDER JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
Nos. A099-869-754, A099-869-755

SUBMITTED OCTOBER 3, 2012[*]—DECIDED NOVEMBER 26, 2012

Before FLAUM, RIPPLE and WILLIAMS, *Circuit Judges*.

FLAUM, *Circuit Judge*. Hafsa Shaikh and her husband,
Asim Shaikh, Pakistani citizens, endured a series of

[*] We granted the petitioners' unopposed motion to waive oral
argument. Thus, the appeal is submitted on the briefs and
record. *See* Fed. R. App. P. 34(a)(2)(C).

threats and attacks by members of the Muttahida Quomi Movement (the "MQM"). They now petition for review of an order of the Board of Immigration Appeals (the "Board") denying their applications for asylum or withholding of removal. The Board upheld the immigration judge's order of removal, concluding that the Shaikhs did not establish refugee status because they did not demonstrate that the MQM targeted them on account of a protected characteristic. The Shaikhs argue that the Board applied an incorrect legal standard by requiring that political opinion be the MQM's *primary* motive for targeting them. We deny the petition for review.

## I. Background

Hafsa and Asim entered the United States in 2006 and applied for asylum several months later. In 1984, Hafsa left her native India and moved to Karachi, Pakistan, for an arranged marriage to her cousin (not Asim). She became a naturalized citizen of Pakistan shortly thereafter and relinquished her Indian passport.

Hafsa's new hometown of Karachi presented an environment full of violence, crime, and corruption spurred on by political and ethnic rivalries. *See* Jane Perlez, *Karachi Turns Deadly Amidst Pakistan's Rivalries*, N.Y. Times, Nov. 18, 2010.[1] In 2010, the city was the most dangerous area in Pakistan outside of war zones. *Id.* It earned this

---

[1]  Available at http://www.nytimes.com/2010/11/19/world/asia/ 19karachi.html?pagewanted=all&_moc.semityn.www. (last accessed Nov. 20, 2012).

ignoble distinction after 1,350 people died in targeted political attacks, more than in the rest of Pakistan combined. *Id.*

Such violence largely results from tension between two ethnic groups in Karachi, the Mohajirs and Pashtuns. *Id.* Mohajirs, Urdu-speaking people who left India in 1947 after its partition, have long dominated the city. *Id.* Pashtuns, on the other hand, are immigrants from war-plagued areas of northern Pakistan. *Id*. The MQM arose from this conflict. It styles itself as a political party representing Mohajirs but has long been at the center of violence in Karachi. *Id.* The party dominates local politics, often controlling the mayor's office, the police force, and the majority of other local government positions. *Id.*

Hafsa was unaware of this history of violence when she discovered the MQM. Drawn to the party by promises to improve infrastructure and rid Karachi of the quotas used to fill government jobs, Hafsa and her first husband began supporting the party in 1988. She attended MQM meetings, collected donations for the party, and encouraged her friends and family to support the party. She was never a member of the party, however. By 1991, Hafsa became disillusioned by the warring factions within the party and its involvement in illegal activities. When she stopped supporting the party in 1991, her husband and his friends within the MQM pressured her to reconsider, but she refused.

Hostility towards Hafsa from MQM members began in 1999 after she began an extramarital romantic rela-

tionship with Asim. Asim was also married at that time to his then-wife Afroz, an MQM member. When Afroz discovered her husband's affair with Hafsa, she told Hafsa's then-husband about it. She also began calling Hafsa at work and warning her to keep away from Asim, enlisting friends to do the same. Subsequently, Hafsa and Asim both filed for divorce and shortly there-after married.

Beginning in June 2001, the harassment of the Shaikhs intensified, taking on a more political dimension. Other MQM members began calling Hafsa as often as three times a month. Although Afroz limited her calls to personal attacks and insults, the MQM members accused Hafsa of betraying the party and demanded that she leave Asim so he could return to their "Mohajir sister" Afroz. The callers also demanded she renew her own support of the MQM. They told Hafsa that, if she did not leave Asim and return to the MQM, she "would not have the right to live." Hafsa never reported these calls to the authorities or her employer because she feared losing her job and the MQM controlled the police.

In addition to these threatening calls, the Shaikhs survived three incidents of violence between 2002 and 2005. First, while driving home, another vehicle rammed Hafsa's car and sped away. The accident injured her hand, requiring stitches. Although Hafsa never saw the driver, MQM members later described the crash as an attempt on her life and told her she would not survive the next attack. About a year later, three armed men entered Hafsa's workplace; one pushed his gun against

Hafsa's forehead and told her that, because she had not heeded the MQM's warnings, they would kill her. The gunman then ordered his accomplice to slit Hafsa's throat, but Hafsa's former manager intervened and paid them $3,000 to leave. Finally, the MQM attacked the Shaikhs on their drive home from work, pulling Hafsa from the car and beating Asim when he came to her rescue. Hafsa narrowly escaped, but the MQM kidnapped Asim. They took him to a barn on Karachi's outskirts, tied him to a pole, and beat him repeatedly over the next two days. While beating Asim, the MQM members referenced his ethnicity by calling him a dirty Sindhi (an ethnic group originally native to the Sindh province of the Indian empire); told him to reunite with Afroz, their Mohajir sister; and demanded that he urge Hafsa to return to the MQM.

After the hearing, the immigration judge noted the Shaikhs' "consistent credible testimony" but denied their applications for asylum, withholding of removal, and protection under the United Nations Convention Against Torture. He concluded that only the kidnapping incident rose to the level of persecution but did not occur "on account of" their political opinion. Because the MQM did not seriously threaten or attack Hafsa until after her affair with Asim, the immigration judge could not "conclude that one of the central reasons for the harm was [Hafsa's] prior minimal support for the MQM." Additionally, the immigration judge found that the Shaikhs had not shown that the government of Pakistan was unwilling or unable to protect them.

The Board, agreeing with the immigration judge's reasoning, dismissed the Shaikhs' appeal. It emphasized that, though the MQM may have pressured Hafsa before her marriage to Asim, "the more serious threats, kidnapping, and actual and attempted violence experienced by the [Shaikhs] at the hands of MQM supporters occurred after [Asim's] ex-wife discovered the [Shaikhs'] extra-marital relationship." Thus, it found "the MQM's motivation to have [Hafsa] rejoin the MQM was secondary and not the group's primary motivation." Finally, the Board agreed that the MQM, though it may have engaged in "forced recruitment," did not target the Shaikhs "primarily because . . . [they] harbored and expressed an opposing political opinion or because they were viewed as political opponents by the MQM."

## II. Discussion

Qualifying for asylum requires a showing of refugee status. 8 U.S.C. § 1158(b)(1)(A). As relevant here, a refugee is "unable or unwilling to return" to his or her home country "because of persecution or a well-founded fear of persecution on account of . . . political opinion." § 1101(a)(42). This requires the asylum applicant to offer direct or circumstantial evidence showing that his or her political opinion "was or will be at least one central reason for persecuting the applicant." § 1158(b)(1)(b)(i); *see also Martinez-Buendia v. Holder*, 616 F.3d 711, 715 (7th Cir. 2010).

We review decisions of the Board for substantial evidence. Thus, we affirm the Board's decision and deny

the petition for review when "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105a(a)(4)). We grant the petition for review, reversing the Board, only when the applicant presented to the immigration judge evidence "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Bueso-Avila v. Holder*, 663 F.3d 934, 937 (7th Cir. 2011) (quoting *Elias-Zacarias*, 502 U.S. at 483-84). The Shaikhs did not present such evidence so we deny the petition.

To begin, the Shaikhs argue that the immigration judge applied the incorrect legal standard to their applications, improperly requiring them to carry a higher burden of proof than the statute requires. While the statute requires only that political opinion be "at least one central reason" for the persecution, they argue that the immigration judge improperly required political opinion as the "primary" reason behind the persecution. Such a standard, the Shaikhs point out, breaks with this court's precedent allowing mixed motives to satisfy the asylum standard. *See, e.g.*, *Bueso-Avila*, 663 F.3d at 937 (noting "it is not necessary that the persecutor be motivated primarily on account of one of the grounds in the Act"); *Mohideen v. Gonzales*, 416 F.3d 567, 570 (7th Cir. 2005) (noting "an individual may qualify for asylum if his or her persecutors have more than one motive as long as one of the motives is" listed in § 1158(b)(1)(A)).

Viewing the immigration judge's ruling as a whole, we do not believe he applied an incorrect standard. Indeed,

the Shaikhs ignore his explicit conclusions that political opinion was not "one of the central reasons for the harm." His passing comment that political opinion was not the "primary motivation" does not alter this conclusion. Indeed, the word "central" requires applicants to show, not just that a protected status played some part in motivating a persecutor but that it played more than a superficial or minor part. *Shaikh v. Holder*, 588 F.3d 861, 864 (5th Cir. 2009) (quoting *Matter of J-B-N & S-M*, 24 I. & N. Dec. 208, 212, 214 (BIA 2007)); *see also Dallakoti v. Holder*, 619 F.3d 1264, 1268 (10th Cir. 2010); *Quinteros-Mendoza v. Holder*, 556 F.3d 159, 164 (4th Cir. 2009); *Singh v. Mukasey*, 543 F.3d 1, 5 (1st Cir. 2008). That is precisely the standard the immigration judge applied here, recognizing that the Shaikhs "may" have experienced "some hostility . . . because they were not active supporters of the MQM" but that such lack of support was not "one of the central reasons for the harm."

*Bueso-Avila* is not to the contrary. True, that case did state that "it is not necessary that the persecutor be motivated primarily" by a protected ground. 663 F.3d at 937. But that does not mean an immigration judge errs in denying asylum when an unprotected ground forms the primary motivation for the persecution and secondary motivations rooted in protected grounds do not rise to the level of central motivations.

We do not suggest that secondary motives can never qualify as a central reason for the persecution nor do we question our previous mixed motive cases. True, the Real ID Act of 2005 raised the burden of proof an

asylum applicant must satisfy—requiring that the protected ground be a "central reason" for the persecution. § 1158(b)(1)(B)(i). But that legislation, in referring to "*at least one* central reason," *id.* (emphasis added), recognizes that multiple central reasons may drive the persecution. *See Ndayshimiye v. Attorney General*, 557 F.3d 124, 129-30 (3d Cir. 2009). Thus, the Real ID Act modifies our earlier mixed motive cases only to require among that mix of motives a protected ground qualifying as a central reason. Indeed, that ground may be a secondary (or tertiary, etc.) reason and still justify asylum. In short, when more than one possible motive exists, the asylum applicant must show that the protected status played more than a minor role in motivating a persecutor. *See Parussimova v. Mukasey*, 555 F.3d 734, 740-41 (9th Cir. 2009) (the statute does not require that a protected ground "account for 51% of the persecutors' motivation"); *Ndayshimiye*, 557 F.3d at 129-31 (rejecting the requirement that a protected status not be "subordinate" to an unprotected status). That is all the immigration judge required here.

Substantial evidence supports the conclusion that political opinion did not centrally motivate the MQM's persecution of the Shaikhs. The Board concluded that the MQM directed, at most, only some hostility at the them because of Hafsa's earlier "minimal support" of the party. Therefore, the immigration judge and the Board concluded that political opinion, at best, was only an incidental or superficial motivation for the MQM's persecution of the Shaikhs: over a decade passed after Hafsa stopped supporting the party in 1991 before serious

incidents of violence occurred in 2002. This violence, the immigration judge and Board concluded, sprung directly out of Afroz's discovery of the affair between Hafsa and Asim. Furthermore, the MQM "repeatedly and explicitly, demanded that [Asim] leave [Hafsa] and return to his ex-wife, who the MQM referred to as their 'Mohajir sister.'" Although MQM members did refer to Hafsa as a traitor to the party and urged her to return to the fold, the repeated references to her marriage to Asim combined with the absence of serious violence before Afroz's discovery of the Shaikhs' relationship support the Board's finding that political animosity had only a minor role in motivating the MQM. After all, Afroz never mentioned political opinion in her threatening phone calls to Hafsa. Therefore, the Board's conclusion that political opinion was not central to the Shaikhs' persecution is supported by substantial evidence.

Finally, the Shaikhs argue for the first time that the immigration judge and the Board did not properly evaluate evidence that the MQM persecuted them on account of nationality. Because the Shaikhs did not raise this claim during the administrative proceedings, they have not exhausted all administrative remedies and have waived the issue. *Sarmiento v. Holder*, 680 F.3d 799, 803-04 (7th Cir. 2012); *Ghani v. Holder*, 557 F.3d 836, 839 (7th Cir. 2009); *Hamdan v. Gonzales*, 425 F.3d 1051, 1059 n.14 (7th Cir. 2005).

### III. Conclusion

For the reasons stated herein, we DENY the Shaikhs' petition for review.