# United States Court of Appeals

### For the Eighth Circuit

———————————————

No. 17-1653

———————————————

Bryan Alexander Gomez-Rivera

*Petitioner*

v.

Jefferson B. Sessions, III, Attorney General of the United States

*Respondent*

——————————

Petition for Review of an Order of the
Board of Immigration Appeals

——————————

Submitted: May 17, 2018
Filed: July 31, 2018

——————————

Before SHEPHERD, KELLY, and GRASZ, Circuit Judges.

——————————

SHEPHERD, Circuit Judge.

Bryan Alexander Gomez-Rivera, a native and citizen of El Salvador, petitions for review of an order of the Board of Immigration Appeals ("BIA") upholding an immigration judge's ("IJ") denial of his applications for asylum and withholding of removal. We affirm.

## I. Background

Gomez-Rivera entered the United States in June 2014, when he was 13 years old. In August 2014, the Department of Homeland Security commenced removal proceedings against him. Gomez-Rivera conceded removability and designated El Salvador as the country of removal. He was granted voluntary departure, but subsequently applied for asylum under 8 U.S.C. § 1158(b)(1)(A) and withholding of removal under 8 U.S.C. § 1231(b)(3) based on his asserted membership in a particular social group—comprised of the nuclear family members of his father—and imputed anti-gang political opinion.

Gomez-Rivera testified that in El Salvador members of the MS-13 and MS-18 gangs harassed and attempted to recruit him from ages ten to thirteen. Members of MS-13 approached him two to three times a week at the soccer field. They hit him during soccer games and threw rocks at him when he rode his bike to the store. Approximately four months before he left El Salvador, five members of the gang kicked and beat him at the soccer field. Members of the MS-18 gang approached him at school, but never physically harmed him. Gomez-Rivera stated that the gangs killed three boys and he was afraid they would kill him too.

Gomez-Rivera claims he was targeted by the gangs because his father was a former police officer in El Salvador. His father—whose nickname is "gallo," which means rooster—fled El Salvador in 2006 or 2007 after being threatened by gang members. Gomez-Rivera was around six years old at the time. Although the gangs never claimed to target Gomez-Rivera because of his father, they referred to Gomez-Rivera as "son of the gallo" and told him they wanted to use him to attract his father. Gomez-Rivera testified he was approached by gangs more than others were, but also stated his friends, who did not have police officer fathers, were approached the same number of times per week as he was.

The IJ found Gomez-Rivera credible, but denied his claims. The IJ determined Gomez-Rivera was not eligible for asylum because he established neither past persecution nor a well-founded fear of future persecution on account of a protected ground. The IJ found the evidence was insufficient to show an imputed anti-gang political opinion based on his father's former occupation or to show the gangs targeted him based on his relationship to his father. Rather, the IJ found, the harm Gomez-Rivera experienced was merely incidental or tangential to the gangs' general goal of recruitment. The IJ dismissed Gomez-Rivera's application for withholding of removal for the same reasons.

The BIA dismissed Gomez-Rivera's appeal, finding he failed to demonstrate the persecution was or will be on account of a protected ground. Although the gangs referenced Gomez-Rivera's father, the BIA found the IJ did not clearly err in concluding the gangs targeted Gomez-Rivera for general recruitment purposes and his relationship to his father was merely incidental or tangential to that goal.

Gomez-Rivera appeals, claiming the IJ and BIA applied the incorrect legal standard and erred in finding he was not persecuted on account of his particular social group or political opinion.

## II. Discussion

"We review the BIA's decision as the final agency decision, but review the IJ's decision to the extent that the BIA adopted the IJ's findings or reasoning." Mendoza-Saenz v. Sessions, 861 F.3d 720, 722 (8th Cir. 2017) (per curiam). "We review the BIA's legal determinations de novo, according substantial deference to the BIA's interpretation of the statutes and regulations it administers." Id. (internal quotation marks omitted). "[F]indings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

To be eligible for asylum, Gomez-Rivera must show he is a "refugee." A refugee is an alien "who is unable or unwilling to return to [his country of nationality] . . . because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Id. § 1101(a)(42)(A). To show that the persecution was "on account of" one of these five protected grounds, Gomez-Rivera must show the protected ground was "one central reason" for the persecution. Id. § 1158(b)(1)(B)(i). It need not be the sole nor primary reason. Marroquin-Ochoma v. Holder, 574 F.3d 574, 577 (8th Cir. 2009) ("[T]he persecution need not be solely, or even predominantly, on account of the [protected ground.]"). But, the protected ground "cannot be merely incidental or tangential" to another reason for the persecution. In Re J-B-N- & S-M-, 24 I. & N. Dec. 208, 213 (B.I.A. 2007) (internal quotation marks omitted).

Gomez-Rivera first claims the IJ and BIA applied the incorrect legal standard in requiring him to show his social group or political opinion was the predominant reason for the persecution. However, the IJ and BIA both explicitly stated the correct legal standard: a protected ground must be "one central reason" for the persecution and cannot be merely "incidental or tangential" to another reason. After engaging in "meaningful inquiry" of "the particular circumstances surrounding the alleged persecution," Marroquin-Ochoma, 574 F.3d at 577-78, the IJ and BIA both ultimately concluded the protected grounds Gomez-Rivera alleged were "incidental or tangential" to the gangs' goal of recruiting new gang members. We therefore find the IJ and BIA applied the correct legal standard.

Gomez-Rivera next argues the BIA erred in finding that membership in his particular claimed social group—nuclear family members of his police officer father—was not "one central reason" for the persecution. The BIA recognized that gang members occasionally referenced Gomez-Rivera's father when attempting to recruit him: calling him by the same nickname and suggesting they could use him to

-4-

attract his father. The BIA also recognized the expert witness testimony that gang members often target family members of police officers. Nevertheless, the BIA found Gomez-Rivera's relationship to his father was not a central reason for the persecution, but rather "incidental or tangential" to general gang recruitment. Because the evidence does not "compel[] [a reasonable factfinder] to conclude to the contrary," we affirm. 8 U.S.C. § 1252(b)(4)(B).

The evidence indicates that, rather than singling Gomez-Rivera out, the gangs attempted to recruit him in much the same way as other young men his age who were not related to police officers. In fact, Gomez-Rivera testified that gang members approached his friends as frequently as they approached him. This suggests the gangs were not targeting Gomez-Rivera because he was the son of a police officer, but because he was a young man of the typical age of recruitment. Cf. Cambara-Cambara v. Lynch, 837 F.3d 822, 826 (8th Cir. 2016) (finding family of wealthy landowners were targeted due to their prosperity, not their family status). We do not suggest that just because other young men were persecuted that necessarily means Gomez-Rivera was not persecuted on account of his relationship to his father. Indeed, in De Brenner v. Ashcroft, we found that although wealthy individuals were generally persecuted by guerillas, the wealthy petitioner was singled out because of her political beliefs. 388 F.3d 629, 631 (8th Cir. 2004). In that case, however, there was "overwhelming evidence" the petitioner was specifically targeted on account of a protected ground. Id. at 637. Here, the evidence is insufficient to compel a similar conclusion.

As the BIA noted, Gomez-Rivera's father left El Salvador several years before the gangs began to approach Gomez-Rivera. Although the expert testified gang members target police officers' families in order to gain access to information, Gomez-Rivera would not have access to such information as his father was no longer in the country. In addition, Gomez-Rivera's sister—who has the same father—remains in El Salvador without persecution. See Bernal-Rendon v. Gonzales, 419 F.3d 877, 881 (8th Cir. 2005) ("An alien's fear of persecution [based on family

-5-

membership] is reduced when her family remains unharmed in her native country."). While Gomez-Rivera is correct that he need not prove all family members were persecuted, cf. Tegegn v. Holder, 702 F.3d 1142, 1147 (8th Cir. 2013), the lack of persecution faced by his sister bolsters the conclusion that the gangs were not seeking out police officers' families, but rather boys of a certain age. Thus, a reasonable factfinder could conclude that the gangs were targeting Gomez-Rivera for general recruitment purposes and his relationship to his father was merely "incidental or tangential" to that goal.

Gomez-Rivera likewise challenges the BIA's finding that his imputed political opinion was not "one central reason" for the persecution. In determining whether an applicant for asylum was persecuted on account of his political beliefs, "it does not matter if the applicant actually holds the political opinion that the persecutor attributes to [him]. Rather, we consider the political views the persecutor rightly or in error attributes to [a] victim[]." De Brenner, 388 F.3d at 635 (second and third alternation in original) (internal quotation marks omitted).

Gomez-Rivera claims gang members would assume his opposition to gangs due to his ties to the police. The expert also testified that gangs in El Salvador have joined forces under the name of "Mara 503" and have made efforts to become political actors. However, we have held the mere fact that a gang "operate[s] in a political framework" is not enough to establish that opposition to the gang constitutes a political opinion. Marroquin-Ochoma, 574 F.3d at 578 (internal quotation marks omitted). "At most, evidence that the gang is politically minded could be considered evidence that the gang members would be somewhat more likely to attribute political opinions to resisters." Id. Here, Gomez-Rivera suggests only that the gangs would assume he was a resister. The evidence is insufficient to establish an imputed political opinion. Cf. De Brenner, 388 F.3d at 638 (finding imputed political opinion where guerillas "labeled [the applicant] a political enemy" based on her ties to an opposing political party). Thus, the evidence does not compel a finding that the

-6-

gangs were "concerned with [Gomez-Rivera's] political beliefs," rather than "simply trying to fill their ranks." Dominguez v. Ashcroft, 336 F.3d 678, 680 (8th Cir. 2003).

Because the evidence does not compel a finding that Gomez-Rivera was persecuted on account of his social group or political opinion, his asylum claim fails. And, for the same reasons, Gomez-Rivera's application for withholding of removal also fails. Marroquin-Ochoma, 574 F.3d at 579 ("To qualify for withholding of removal, an applicant has the burden of showing a clear probability that [his] life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." (internal quotation marks omitted)).

### III. Conclusion

Accordingly, we deny Gomez-Rivera's petition for review.

KELLY, Circuit Judge, dissenting.

I agree that substantial evidence supports the agency's finding that Gomez-Rivera was not persecuted based on an imputed anti-gang political opinion. I respectfully dissent, however, because I believe the court—like the immigration judge and BIA before it—has overlooked evidence that would compel a reasonable adjudicator to conclude that Gomez-Rivera's membership in his father's nuclear family was "one central reason" the gangs persecuted him. See 8 U.S.C. § 1252(b)(4)(B) (standard of review); Marroquin-Ochoma v. Holder, 574 F.3d 574, 577 (8th Cir. 2009) ("one central reason" standard) (quotation omitted).

"To qualify for asylum, an alien must show that a protected ground 'was or will be at least *one central reason* for persecuting'" him. Garcia-Moctezuma v. Sessions,

-7-

879 F.3d 863, 867 (8th Cir. 2018) (quoting 8 U.S.C. § 1158(b)(1)(B)(I)). "Under the 'one central reason' nexus standard, a protected ground need not be the sole reason for persecution, but the protected ground cannot be 'incidental or tangential to the persecutor's motivation.'" Id. at 868 (citing In re J-B-N & S-M-, 24 I & N Dec. 208, 213 (BIA 2007)). When an asylum-seeker claims that a persecutor had multiple motivations, only some of which are based on protected grounds, the immigration judge cannot merely attribute the persecution to a non-protected ground. Marroquin-Ochoma, 574 F.3d at 577. "Rather, it remains necessary to carefully examine the record to determine whether the evidence shows that the persecution also occurred on account of a protected ground." De Brenner v. Ashcroft, 388 F.3d 629, 636 (8th Cir. 2004).

Here, Gomez-Rivera offered credible, unrebutted evidence that his relationship to his father was one central reason he was persecuted by members of MS-13. Gomez-Rivera's father was a police officer assigned to guard gang members and to transport them to prison. He wore his police uniform and drove his squad car when he visited Gomez-Rivera each week. Gomez-Rivera's father fled El Salvador in 2006, after a gang member approached him on the street and threatened to kill him.

Members of the MS-13 gang started approaching Gomez-Rivera two to three times per week when he was just ten years old. They attempted to recruit him and also subjected him to violent harassment. On eight different occasions, they threatened to kill him if he did not join the gang. And, just a few months before Gomez-Rivera fled to the United States, a group of five gang members attacked him, hitting and kicking him. As the court observes, Gomez-Rivera testified that gang members also approached his friends two to three times per week. But, the gang members bothered him more than they did his friends, focusing their attention on him because his father was a police officer. When they harassed Gomez-Rivera, the gang members frequently called him "Gallo," a nickname he shares with his father, but they also referred to him as *the son* of Gallo." The gang members knew Gomez-

Rivera's father had detained them, and talked about his father when they were recruiting and threatening to kill Gomez-Rivera. They told him that "if [he] joined them, then [his] father would suffer because of that." The gang members also told Gomez-Rivera that "since [his father] was a police officer, they were going to use [Gomez-Rivera] . . . to attract him, because they knew that [his father] had captured their friends." In other words, "they knew that if they got [Gomez-Rivera, his] father would go back for [him]."

And University of Minnesota Professor Patrick McNamara testified that the gangs targeted Gomez-Rivera because of his father's gang-related duties as a police officer. In his view, while Salvadoran gangs have undertaken a broader effort to recruit young people, the gangs also specifically target members of police officers' families, making it "extremely dangerous for relatives of people . . . in the police department." In sum, as Professor McNamara opined in his written report:

> While many other young boys in El Salvador have had to abandon their homes because of gang recruitment efforts, threats of violence, beatings, and attempted homicides, [Gomez-Rivera's] situation is significantly different and significantly more dangerous. Police officers and their families, particularly sons, are primary targets of all criminal organizations in El Salvador.

I believe that this evidence, all of which the immigration judge found credible, would compel a reasonable adjudicator to conclude that Gomez-Rivera's membership in his father's nuclear family was "one central reason" for the persecution he faced from the gangs. Therefore, I would grant the petition.

_____