[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-14133
Non-Argument Calendar
_____

Agency No. A203-034-057


ANGELA ADRIANA RIVERA MELO,

                                                                Petitioner,

versus

U.S. ATTORNEY GENERAL,

                                                                Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(October 31, 2018)

Before TJOFLAT, MARTIN, and NEWSOM, Circuit Judges.

PER CURIAM:

Angela Melo, a native and citizen of Colombia, petitions for review of the Board of Immigration Appeals' decision to deny her asylum and withholding of removal claims.  After careful review, we grant the petition and remand for further proceedings.

## I.

Melo grew up in Colombia as part of a politically active family.[1]  Her father was a member of the Colombian Liberal Party and served as a councilman at varying points in time for two different municipalities, La Mesa and Anolaima.  As a child, Melo accompanied her father to party meetings.  She eventually followed in her father's footsteps and joined the party as well.

Her family's political connections helped secure Melo a job after she finished law school.  At her father's request, the mayor of Anolaima, who was also a member of the Colombian Liberal Party, appointed Melo to serve as the police and traffic inspector for the municipality.  Part of Melo's responsibilities as inspector included corpse retrieval.  As a result, when the office received word in February 2000 of a dead body found in one of Anolaima's rural districts, Melo was dispatched to the scene of the homicide.  While there, she noticed a bracelet bearing the word "FARC" resting on the ground by the body.  FARC refers to the Revolutionary Armed Forces of Colombia, an anti-government guerilla group.

---

[1]  The BIA presumed Melo was credible, as do we.  The factual background therefore draws heavily from her testimony before the immigration judge ("IJ").

Melo tagged the bracelet as evidence and attached it to a report, both of which she then forwarded to the prosecutor's office.

The next day, she returned to her office and found a folded piece of paper on her desk. The letter was signed "FARC, Front 42" and warned her not to file evidence of the bracelet if she wished to avoid certain consequences. Melo ignored the threat because it "was against [her] principles and ethics," and did not bring the note to the attention of her superiors.

Two months passed without incident. In April, however, five young men cornered Melo while she rode the bus home from work. The bus was mostly empty, and the men surrounded Melo by sitting in front of her, next to her, and directly behind her. They greeted her by name and asked her why she was being so "disobedient." They wondered why she didn't pay attention to the orders "fired at [her]" and expressed their hope that "nothing [would] happen" to her as a result of her disobedience. Before they left the bus, they warned her one last time to do as they said and advised her that if she wanted to stay in their good graces, she could choose to work for them.

A month later, an unknown man approached Melo while she was conducting a land survey and told her, "Doctor, we have not forgotten you." Melo immediately thought the man was a member of FARC. Alarmed by this series of events, Melo informed the Army commander and a local government

3

representative of the encounter.  They assigned her a police officer as security detail in response.  However, the officer was only permitted to guard Melo during her work hours.

Nonetheless, the threats continued to escalate.  In late May of the same year, Melo received an anonymous phone call at her work place warning her not to be "too confident" and telling her she would "soon . . . have more news from us." Frightened, Melo asked for leave and fled to her friend's place, which was located far from Anolaima.  While there, she received another phone call.  This time, the caller asked how her vacation was going and informed her that in a few days, some "associates" would meet her at her office so she could issue them health insurance cards normally reserved for low-income people.  The anonymous caller specifically told Melo, "I imagine that you have not forgotten us, because we have not forgotten you, . . . [e]specially for what you did. . . . Don't fail us.  We'll know."

Melo returned to work in August.  She informed the mayor and police commander of these threats, and was assigned a police officer for protection once again.  In September, a woman came into her office and requested a health insurance card.  Melo informed the woman she could not issue the card because it was not part of her responsibilities as inspector.  Upon hearing this, the woman became enraged and exclaimed, "Did the bosses talk to you?  What do you think,

4

that we're playing games?  We're the FARC, Front 42.  And . . . you . . . have become a military target."

The mayor told Melo FARC was just trying to scare her and that they wanted a favor from her.  He also told her they could not afford to give her additional officers for protection.  In the meantime, Melo received numerous pamphlets, notes, and phone calls castigating her for disobeying instructions and ordering her to "work for us."  Approximately half a year later, a bomb exploded at a conference Melo was scheduled to attend.  Three people died and many were wounded.  Melo escaped unscathed because she had been delayed by bad weather while traveling to the forum.  Feeling "totally cornered and accosted [by FARC]," Melo resigned from her position a few months later and moved to Bogotá to stay with family.

While living in Bogotá, Melo received a sympathy card signed by Front 42. The card explained that the bomb had been meant for her and that she would not escape the next one.  Convinced she had indeed become a military target, Melo soon fled to the United States, arriving on September 27, 2001.  She applied for asylum on May 28, 2002, alleging persecution based on political opinion and her status as a former government employee who refused to assist FARC.  The Immigration and Naturalization Service denied her application on September 26, 2002.

5

On August 23, 2011, the Department of Homeland Security ("DHS") commenced removal proceedings against Melo and issued her a Notice to Appear. DHS charged her with removability under 8 U.S.C. §§ 1227(a)(1)(B) and 1227(a)(1)(G)(ii) for overstaying her nonimmigrant visa and entering into a false marriage for the purpose of procuring an immigrant visa. Through counsel, Melo admitted both charges and renewed her 2002 application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT") as relief from removal. Following a hearing, the IJ denied Melo's applications and ordered her removed to Colombia. The BIA affirmed the IJ's order of removal solely on the basis Melo had failed to establish she suffered persecution on account of a protected ground for her asylum and withholding claims, otherwise known as the "nexus" requirement.[2]

Melo timely petitioned for review.

## II.

Where, as here, the BIA does not expressly adopt the IJ's opinion, our review is limited only to the BIA's decision, except to the extent the BIA "adopts the IJ's reasoning." See Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). We review de novo the BIA's conclusions of law, and any factual determinations

---

[2] Melo did not appeal the IJ's denial of her CAT claim to the BIA.

under the substantial evidence test.  See Zhou Hua Zhu v. Attorney Gen., 703 F.3d 1303, 1307 (11th Cir. 2013).

## III.

A petitioner seeking asylum or withholding of removal "must establish a nexus between a statutorily protected ground and the feared persecution." Mehmeti v. U.S. Attorney Gen., 572 F.3d 1196, 1200 (11th Cir. 2009) (per curiam).  Relying solely on this requirement, the BIA denied Melo's asylum and withholding applications for failing to "show[] that her political opinion was at least one central reason for any past harm or feared future harm."  The BIA assumed Melo's proposed social group of former Colombian government employees who refused to help FARC was legally cognizable.  It nonetheless affirmed the IJ's decision because the IJ "did not clearly err in finding a failure to show that FARC was not motivated simply by a desire not to be implicated in criminal activity."

Melo argues the BIA erred because she presented sufficient evidence to demonstrate that she suffered past persecution based at least in part on either her political opinion or her status as a former government employee who refused to assist FARC.  This claim consists of two separate arguments, one legal and the other factual.  The legal question is whether the BIA applied the correct standard when assessing whether Melo sufficiently showed a nexus between the harm she

7

suffered and a protected ground. Because we conclude the agency did not, we need not address whether substantial evidence supports the BIA's factual determinations.[3]

The crux of the BIA's mistake is this: Melo's asylum and withholding claims are governed by the law as it existed prior to the enactment of the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231. Because Melo filed her asylum application in 2002, and the REAL ID Act did not take effect until May 11, 2005, the agency was required to apply the pre-REAL ID Act standard for nexus— which, as the government acknowledges in its brief, the agency did not. See Kaur v. Gonzales, 418 F.3d 1061, 1064 n.1 (9th Cir. 2005).[4]

Before the enactment of the REAL ID Act, a petitioner like Melo could demonstrate persecution on account of a protected ground as long as she could

---

[3] We note, however, Melo provided ample evidence FARC targeted her for reasons that went beyond a simple desire to avoid criminal prosecution. She testified FARC escalated its threats and detonated a bomb meant for her after she declined to issue one of its members a health insurance card. Similarly, she was not told she had become a military target of FARC's until after the health insurance incident. She received countless notes, pamphlets, and calls ordering her to obey FARC's directives and threatening harm if she did not. Indeed, the BIA acknowledged in its decision that Melo's testimony "further reflects that FARC continued to harass her because of her refusal to work with them." Because the BIA assumed Melo's proposed social group of former Colombian government employees who refused to assist FARC was legally cognizable, it is difficult to see how substantial evidence could support the agency's determination that there was no nexus between the harm Melo suffered and Melo's status as a member of that group.

[4] In a footnote, the government suggests Melo does not challenge the BIA's use of an erroneous legal standard. But, as the government acknowledges, Melo repeatedly cites the correct standard and argues that her evidence can meet it. We take this as a challenge to the BIA's legal error. See Fed. Sav. & Loan Ins. Corp. v. Haralson, 813 F.2d 370, 373 n.3 (11th Cir. 1987).

8

show that "the harm was motivated, <u>at least in part</u>, by an actual or implied protected ground." <u>Matter of N-M-</u>, 25 I. & N. Dec. 526, 530 (BIA 2011) (quotation marks omitted); <u>see</u> <u>also</u> <u>Tan v. U.S. Attorney Gen.</u>, 446 F.3d 1369, 1375 (11th Cir. 2006) (adopting same standard).  Thus, a petitioner could qualify for asylum as long as one of the motives for harm was protected, even if that motive was not necessarily a driving force behind the persecutor's actions.  <u>See</u> <u>In re J-B-N- & S-M-</u>, 24 I. & N. Dec. 208, 214 n.9 (BIA 2007) (clarifying the difference); <u>see</u> <u>also</u> H.R. Rep. No. 109-72, at 162–63 (same).

The REAL-ID Act has since established a petitioner applying for asylum after May 11, 2005 must show that his or her "race, religion, nationality, membership in a particular social group, or political opinion <u>was or will be at least one central reason</u> for persecuting the applicant." <u>In re J-B-N & S-M-</u>, 24 I. & N. Dec. at 212 (quoting 8 U.S.C. § 1158(b)(1)(B)(i)).  In other words, the protected ground must be a primary or essential part of the persecutor's motivation.  A number of courts have recognized that this language "places a more onerous burden on the asylum applicant than the 'at least in part' standard . . . previously applied." <u>Parussimova v. Mukasey</u>, 555 F.3d 734, 740 (9th Cir. 2009); <u>see</u> <u>Shaikh v. Holder</u>, 702 F.3d 897, 901 (7th Cir. 2012) ("Indeed, the word 'central' requires applicants to show, not just that a protected status played some part in motivating a

9

persecutor but that it played more than a superficial or minor part."); Shaikh v.

Holder, 588 F.3d 861, 864 (5th Cir. 2009).

Melo's 2002 asylum application should have been analyzed under the "at

least in part" nexus standard.  Instead, the BIA required Melo to show that her

protected grounds were "at least one central reason" for her persecution.[5]  This was

legal error, and it necessitates reversal.

We therefore grant Melo's petition for review and remand her asylum and

withholding claims to the BIA for reconsideration in light of this opinion.

**PETITION GRANTED AND REMANDED.**

---

[5] It is not entirely clear which standard the BIA applied to Melo's claimed protected social group of former Colombian government employees who refused to assist FARC.  Because the BIA agreed with the IJ's reasoning on this point, we may look to the IJ's decision for guidance.  See Zhou Hua Zhu, 703 F.3d at 1307.  Here, the IJ found that Melo failed to show the requisite nexus between her proposed social group and the harm she suffered because "it is unclear that FARC was targeting [her] solely because she is a member of that group."  This was clearly erroneous.  As this Court has explained, "[o]ne of th[e] five [protected] grounds need not be the only motivation for the persecution."  Sanchez Jimenez v. U.S. Attorney Gen., 492 F.3d 1223, 1233 (11th Cir. 2007).  This is true of both pre- and post-REAL ID asylum applications.  See In re J-B-N & S-M-, 24 I. & N. Dec. at 213 (explaining the REAL ID Act continues to protect "aliens whose persecutors were motivated by more than one reason").