In the

# United States Court of Appeals
## For the Seventh Circuit

No. 08-1093

SALEEM MUHAMMAD JAN,

*Petitioner,*

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

On Petition for Review
from the Board of Immigration Appeals.
No. A95 925 138

ARGUED JULY 7, 2009—DECIDED AUGUST 6, 2009

Before POSNER, KANNE, and SYKES, *Circuit Judges.*

PER CURIAM. Saleem Muhammed Jan, a native of Pakistan, entered the United States in 1999 and overstayed his visa. When immigration officials initiated removal proceedings, Jan requested asylum and withholding of removal based on his membership in a particular social group, which he describes as Pakistanis who are threatened by government officials bribed to settle private

disputes. He also sought relief under the Convention Against Torture ("CAT"). An immigration judge denied his application and ordered him removed. The Board of Immigration Appeals concurred in the IJ's conclusion and dismissed Jan's appeal. Because the Board's decision was supported by substantial evidence, we deny Jan's petition.

All of Jan's troubles began after a major customer of his fabric exporting business, Musaib Fabrics, refused to pay for a large shipment of fabric, citing poor quality. Musaib, located in Karachi, had contracted in 1998 to sell $1 million U.S. dollars worth of fabric to Prestige Apparels, located in Qatar. The initial shipments of fabric passed inspection, and Prestige's bank in Qatar released payment to Musaib's banks in Pakistan after each shipment. But around October 1998, after receipt of the final shipment, Prestige rejected the fabric as sub-standard and refused to make further payment.

The following month Jan met with the management of Habib Bank, one of Musaib's banks in Pakistan, to discuss his outstanding debts to the bank in connection with the Prestige transaction. According to Jan, Habib's management threatened to use their connections to corrupt Pakistani officials to have him arrested for the debts he owed the bank. But after further discussion, Habib's management backed off of their earlier threats and decided to join a lawsuit that Jan brought in Qatar against Prestige to collect payment. Jan and Habib Bank in fact won their case in 1999, but two years later the decision was reversed by Qatar's highest court, which

ordered Musaib to refund $365,855 to Prestige for the substandard fabric it sold. Shortly thereafter, Habib sued Jan in Pakistan, seeking more than $200,000 for Musaib's outstanding debt from the Prestige deal.

After Prestige stopped payment to Musaib, Jan became unable to pay his business debts, leading to indirect threats instigated by his creditors against him. For instance, sometime in fall 1998, one of Musaib's contractors, Latif Textile, filed a complaint over an unpaid bill with Pakistan's Federal Investigation Agency ("FIA"), the country's national law enforcement agency. Jan in turn was summoned to FIA's Karachi office. At the FIA office, Jan testified, he heard screams for help and saw bruised and beaten people being led out of offices. According to Jan, he met with an FIA agent named Baloch for half an hour, during which time Baloch placed his revolver on the table and told him to pay Latif Textile the $50,000 he owed. Jan testified that he interpreted Baloch's gesture as a threat. Two days after his meeting, Jan visited Latif Textiles's director, who agreed to stop complaining to the FIA as long as Jan demonstrated that he would pay off his debt. But the Latif director parted with the words "I will see you"—an ominous phrase, according to Jan, that reflects a serious threat or warning.

The nature and scope of the FIA's activities were addressed at Jan's removal hearing by Kamran Rizvi, a former Pakistani political activist now living in the United States. Rizvi had served as a human-rights consultant to the Pakistani government for four years and later founded a non-profit organization in Pakistan pro-

moting tolerance and nonviolence. Rizvi testified that the FIA runs detention centers and has been implicated in the torture of prisoners at those centers. He stated that, because police corruption is rampant, individuals with FIA connections pull strings by having agents use intimidation or threats of detention to coerce their adversaries to settle private disputes. When asked what would happen if a person called into the FIA office did not comply, Rizvi responded that the agent could place that person in a detention center and order beatings or torture. Without explanation, Rizvi went on to say that 90 percent of the people called into FIA offices are detained and that Jan was lucky to avoid trouble after his meeting with Baloch.

Jan's business debts led to another unsettling incident in late 1998, when his family members were allegedly ambushed by armed men while driving in Karachi. According to Jan, the men demanded $12,000 in payment for Jan's business debts and threatened to kill him if they were not paid. Jan's family submitted and turned over money and jewelry. The men's identities were unknown, though Jan suspects that they worked for Latif Textiles or perhaps another of Musaib's creditors. And the harassment continued. Jan claims that in the first half of 1999 he received threatening phone calls from people working for Latif Textiles and other creditors. He said that Musaib's creditors also dispatched thugs to his house and office to threaten him and his family with harm unless he settled his debts.

In May 1999 Jan fled to the United States. He says he overstayed his visa to avoid further confrontations

with his creditors in Pakistan. The following month his wife and children moved to the United Arab Emirates to live with her parents. Sometime later, after Jan had departed Pakistan for the United States, the manager of Habib Bank went to Jan's house in Karachi and told his father that if Jan did not pay the money he owed to the bank, "we will send the army people to your house and take you away." In 2000 Jan's cousin visited him in the United States and told him that the FIA was still looking for him. Jan also points to country reports and news articles as evidence that his creditors would bribe officials to detain, torture, or even kill him upon his return.

After a hearing, the IJ found that Jan did not qualify for asylum because his fear of persecution arose from a purely personal dispute and not on account of any ground protected by the INA. The IJ also found Jan ineligible for CAT relief because he failed to establish that it was more likely than not that the FIA would torture him if he returned to Pakistan, especially in the absence of any harm after his meeting with Baloch. The Board of Immigration Appeals ("BIA") subsequently dismissed Jan's appeal. The BIA found Jan ineligible for asylum because he failed to adequately describe a particular social group. And because Jan failed to satisfy the statutory burden required for asylum, the BIA concluded that he could not meet the higher standard for withholding of removal—a clear probability of persecution. Finally, the BIA upheld the IJ's conclusion that Jan was not eligible for CAT relief because he had not shown that he would be tortured if he returned to Pakistan.

In his petition for review, Jan first argues that the BIA and IJ erred in concluding that he would not be tortured by Pakistani government officials upon his return. In support, he points to the 1998 ambush on his family, the documentary evidence of police corruption in Pakistan, and portions of Rizvi's testimony. As further evidence that he would be tortured if returned to Pakistan, Jan notes his encounter with Baloch, as well as Pakistan's "systematic problem" of police torture.

To receive protection under CAT, an individual must prove it more likely than not that he would be tortured if he returns to the country of removal. *See* 8 C.F.R. § 208.16(c); *LaGuerre v. Mukasey*, 526 F.3d 1037, 1040 (7th Cir. 2008); *Prela v. Ashcroft*, 394 F.3d 515, 519 (7th Cir. 2005). Torture must be inflicted by or with the consent of a public official. *See* 8 C.F.R. § 208.18(a)(1); *Boci v. Gonzales*, 473 F.3d 762, 768 (7th Cir. 2007).

Here Jan did not prove a likelihood that he would be tortured upon return by Pakistani government officials. There is no evidence that the government was behind either the 1998 ambush of Jan's family or the other threats made against Jan at his home and office. Further, the country reports and news articles on police corruption in Pakistan are too general and vague to suggest that Jan in particular would face torture. *See Ayele v. Holder*, 564 F.3d 862, 871 (7th Cir. 2009). The only concrete example of government intimidation was Baloch's brandishing the gun in his meeting with Jan, but even in that case Baloch had no further contact with Jan. Nor is there any evidence that Pakistani government officials

contacted Jan or his family during the past ten years. Thus, the evidence does not compel a finding that Jan would be tortured if he returns to Pakistan.

Jan next challenges the BIA's conclusion that he did not identify an appropriate social group. He characterizes his social group as "persons threatened by corrupt officials of the [FIA] in Pakistan." This court has explained that "a characteristic that defines a 'social group' within the meaning of the immigration laws 'must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences.'" *Orejuela v. Gonzales*, 423 F.3d 666, 672 (7th Cir. 2005) (internal citation omitted); *Lwin v. I.N.S.*, 144 F.3d 505, 512 (7th Cir. 1998). Jan's indebtedness, however, is not an immutable characteristic because it is not innate or fundamental to his identity. *See Cruz-Funez v. Gonzales*, 406 F.3d 1187, 1191-92 (10th Cir. 2005) ("Being indebted to the same creditor (unscrupulous or not) is not the kind of group characteristic that a person either cannot change or should not be required to change.").

The petition for review is DENIED.