**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued June 10, 2015
Decided November 4, 2015

**Before**

DANIEL A. MANION, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 14-3432

| | |
|---|---|
| RAMIRO REYES-MENDEZ, *Petitioner*, | Petition for Review of an Order of the Board of Immigration Appeals. |
| *v.* | No. A089-282-753 |
| LORETTA E. LYNCH, Attorney General of the United States, *Respondent*. | |

## O R D E R

Ramiro Reyes-Mendez fears that if he returns to his small hometown in the Mexican state of Veracruz, the Zetas—a powerful drug cartel in Mexico—will extort money from him on threat of death, just as they have done for years to his uncles. The Board of Immigration Appeals denied Reyes-Mendez's application for withholding of removal, concluding that he could not show a nexus between potential future persecution and his membership in a protected social group and, alternatively, that he had not shown that he could not reasonably relocate to a part of Mexico where he would not face persecution. Because we agree with the Board that Reyes-Mendez could reasonably relocate to another part of Mexico, we deny his petition.

Reyes-Mendez entered the United States without inspection in August 2000 at the age of 17. In February 2010 he was arrested for driving without a license and placed into removal proceedings. He applied for asylum, withholding of removal, and protection under the Convention Against Torture and claimed that he would be persecuted because of his membership in three different social groups: the Reyes family, "well-known families who own businesses that are perceived as prosperous," and Mexican citizens who had lived and worked in the United States and would be perceived as wealthy on their return. Reyes-Mendez also suggested that he could be persecuted for his political opposition to the Zetas.

As he testified and explained in his affidavit, Reyes-Mendez was born in 1983 in the town of Yecuatla in the state of Veracruz and lived there with his grandmother from an early age after his parents separated. His mother immigrated to the United States in 1988, where she met Gonzalo Ramirez, with whom she had three daughters. She died in 1994 in a car accident in Illinois. Reyes-Mendez's father, who had remained in Veracruz, died in a work accident in 1990.

In 2000, after graduating high school in Yecuatla, Reyes-Mendez crossed the border into the United States in the Arizonan desert and made his way to McHenry, Illinois. He lived with his uncle, Donato Reyes Zarate until 2005, when Donato returned to Yecuatla and opened a business selling construction materials. Reyes-Mendez stayed in McHenry, moving in with his stepfather, Gonzalo, and his three half-sisters. He currently works at an auto body shop.

Between 2005 and 2010, Reyes-Mendez was charged and pleaded guilty six times to driving without a license, operating an uninsured motor vehicle, and other traffic violations. He provided false names when he was arrested, he said, because he did not want to be returned to Mexico. After his last arrest in 2010, Reyes-Mendez was placed into removal proceedings.

When he realized he might be sent back to Mexico, Reyes-Mendez contacted his uncle Donato. Donato told Reyes-Mendez that the Zetas were extorting money from him and that he feared for his life and for his family. Donato explained that he received his first threat in late 2008, when a person identifying himself as a Zeta telephoned him, insulted him, and told him to deposit money into an account. Donato feared giving Reyes-Mendez more details about the extortion and told him to call his other uncle, Vicente Reyes Zarate, who was also being extorted by the Zetas.

Vicente was more willing to tell Reyes-Mendez about the threats. Vicente also lived in Yecuatla, where he owned two hardware stores and belonged to the Chamber of Commerce. He told Reyes-Mendez that in late 2008, he too had received a call from a man who identified himself as a Zeta and told him that he had to give the Zetas money every month or they would kill him and his family. To underscore the seriousness of the threat, the Zeta described Vicente, his wife, and each of his children, as well as the family's daily habits. He threatened to kill them if they told anyone about the extortion. Initially he demanded a large sum of money, but Vicente could not pay that much, so he agreed to receive 3,000 pesos every month instead. Vicente also told Reyes-Mendez that the Zetas appeared to know a lot about Reyes-Mendez and his immediate family and had even asked specifically about him.

Reyes-Mendez explained to the IJ that his uncles were targeted by the Zetas because they were business owners with financial means. He feared returning to Yecuatla because, as his uncles' nephew, he would also be targeted for extortion and death threats, especially since the Zetas had already asked about him by name. The Zetas, he added, had infiltrated and corrupted both the local and state authorities, including the police forces, and no one in Veracruz could protect him or his family.

The Zetas are considered one of Mexico's most dangerous and violent drug cartels. Originally constituted to serve as the enforcement arm for the Gulf cartel (a powerful cartel based in Tamaulipas, the state directly north of Veracruz), the Zetas' original membership comprised 30 soldiers drawn from Mexico's special forces. The Mexican Ministry of Defense has described them as "the most formidable death squad" in the history of organized crime in Mexico. Their core areas of operation are on the east coast of Mexico, from the state of Tamaulipas along the Texas border down through Veracruz and into the Yucatán Peninsula. In addition to trafficking in drugs, the Zetas engage in a variety of other crimes, including kidnapping, extortion, assassination, and murder for hire. In Reyes-Mendez's home state of Veracruz, they have bribed and extorted local officials and tortured and killed street vendors who refused to sell their specially-marked black-market goods.

Reyes-Mendez testified that if he returned to Mexico, he had nowhere to go but Yecuatla because his entire family lives there. He explained that he would be at risk of harm from the Zetas because he would have to get a job working for one of his uncles.

Reyes-Mendez supplemented his own testimony with an affidavit from his uncle Vicente, which corroborated his story. He also submitted news reports and country-conditions reports from both the U.S. State Department and human rights

organizations. The reports document gang violence and local corruption in Veracruz, the violence of Mexico's drug war in general, and corruption in local government and police throughout Mexico.

The IJ credited Reyes-Mendez's testimony, but concluded that he was not eligible for asylum, withholding of removal, or protection under CAT. The IJ determined that his asylum application was untimely and that changed circumstances did not permit his late filing because he had not applied within a reasonable time of learning about his uncles' extortion.

With regard to Reyes-Mendez's claim for withholding of removal, the IJ first explained that he could not show that he would be persecuted on account of a protected ground. The IJ rejected his proposed social group of "well-known families who own businesses and are perceived as prosperous" because it was defined by profession and wealth, neither of which was an immutable characteristic. His second asserted social group—"Mexican citizens who have lived and worked abroad and are perceived as wealthy"—was also not cognizable, the IJ ruled, because it was simply too broad, and the group lacked any important, common characteristic besides being targeted for persecution. Although the IJ concluded that Reyes-Mendez's family might constitute a protected social group, she concluded that Reyes-Mendez had not shown that his persecutors would persecute him on account of his family ties. The record reflected, instead, she explained, that the cartel was "motivated by its victims' money and will subject them to violence in order to get it or to retaliate against those who refuse to cooperate." The IJ also rejected Reyes-Mendez's claim that he would be persecuted on account of his political opinion. Assuming that his anti-cartel beliefs constituted a political opinion, she concluded that there was insufficient evidence to show that the Zetas would "consider the respondent or his family to hold a political opinion because of [his asylum application] and persecute him accordingly."

Second, the IJ continued, even if Reyes-Mendez could show future persecution on account of a protected ground, he failed to show that he could not reasonably relocate within Mexico. The IJ acknowledged that Reyes-Mendez's family lived in Veracruz, that he relied on them, and that the Zetas maintained a "powerful and violent" presence in Veracruz and other parts of the country, particularly to the south. But the record did not show that the Zetas had a "national presence" and, as a resourceful 28-year-old who had made his own way in the United States, Reyes-Mendez could relocate somewhere else in a country as large and populous as Mexico. The IJ emphasized that Reyes-Mendez had

never had any personal contact with the Zetas, so they would be unlikely to learn his whereabouts if he lived outside Veracruz.

The IJ also denied Reyes-Mendez relief under CAT, concluding that his claim was largely based on "general country conditions" and that he could relocate to avoid torture.

The Board affirmed the IJ's decision and dismissed Reyes-Mendez's appeal. It agreed that his application for asylum was untimely.[1] *See* 8 C.F.R. § 1208.4(a)(4)(i)(A). It adopted the IJ's reasoning that the Zetas simply targeted the "general population for extortion" and any future persecution of Reyes-Mendez would be on account of his wealth or perceived wealth rather than on account of his membership in a particular social group or his political opinion. The Board also declined to remand the case for the IJ to consider five additional news reports that Reyes-Mendez had attached to his brief, determining that this information would not likely change the result.

Reyes-Mendez then petitioned us for review of the Board's decision. *See Reyes-Mendez v. Holder*, No. 13-2289 (7th Cir. Sept. 30, 2013). In lieu of filing a response brief and without conceding any error by the Board, the government moved to remand the case so that the Board could reconsider its nexus and social-group analysis in light of *Tapiero de Orejuela v. Gonzales*, 423 F.3d 666 (7th Cir. 2005), and *Cece v. Holder*, 733 F.3d 662 (7th Cir. 2013) (en banc). Reyes-Mendez opposed the remand, contending that the IJ had already considered *Tapiero* and that the Board simply wanted to "write a better decision affirming the denial" of his application for withholding. We granted the government's motion and ordered the case remanded "in light of the position taken by the respondent."

On remand and without additional briefing, the Board issued its second decision, in which it repeated its social-group analysis word for word. The Board then adopted the IJ's alternative ground—that Reyes-Mendez could reasonably relocate in Mexico—as an additional basis for denying his appeal.

Before moving to the merits of the petition, we must state that we are troubled that the Board did not reconsider its nexus analysis after the government expressly represented to us that this was the basis for the remand. In the current appeal, the government does not defend the Board's unchanged nexus analysis (but neither does it

---

[1] We lack jurisdiction to review this determination. *See Duarte-Salagosa v. Holder*, 775 F.3d 841, 844 (7th Cir. 2014).

concede the issue), instead relying solely on the Board's alternative relocation analysis. It is true the government has wide latitude in requesting a remand from this court, and it may do so if it wishes to have the agency reconsider an issue in light of developing case law, even without confessing error. *Ren v. Gonzales*, 440 F.3d 446, 448 (7th Cir. 2006). Nor was it necessarily improper for the Board on remand to consider an alternative ground—we did not limit the scope of the remand, and the relocation issue had previously been addressed by the IJ. But if the agency is going to disregard the Attorney General's stated justifications for remand, we will be more critical of similar motions in the future, especially when they are opposed by the petitioner.

With regard to the merits, Reyes-Mendez first challenges the Board's conclusion that he would be persecuted only on account of his wealth, rather than on account of his membership in a protected social group—particularly on account of his membership in the Reyes family. He contends that he is "readily identifiable as a member of the Reyes family," which has been subjected to an extortion campaign for several years, and that his membership in the family would make him a target for the Zetas.

We agree with Reyes-Mendez that the Board did not adequately consider whether his membership in his family would be "one central reason" for his potential future persecution. *See Shaikh v. Holder*, 702 F.3d 897, 901 (7th Cir. 2012); *Torres v. Mukasey*, 551 F.3d 616, 629 (7th Cir. 2008) (a family can constitute a particular social group). The Board concluded that "his family members have [not] been extorted for any reason other than the fact that they have money as a result of their successful businesses." But even if true, this does not preclude Reyes-Mendez from being persecuted on account of his membership in the family. *See Cordova v. Holder*, 759 F.3d 332, 339 (4th Cir. 2014) (that applicant's family was not targeted on account of a protected ground did not mean that applicant was not targeted "on account of *his* kinship ties" to his family); *Aldana-Ramos v. Holder*, 757 F.3d 9, 15–16 (1st Cir. 2014) (rejecting Board's conclusion that family is not a protected social group unless a family member can also claim another protected ground). Substantial evidence in the record supports this conclusion: the Zetas appear to have targeted him only after and as a consequence of their successful extortion against his uncles. Were it not for his ties to his uncles, it is difficult to see how Reyes-Mendez would face any particularized threat of persecution on his return.

But as the Board concluded, Reyes-Mendez did not show that he could not reasonably relocate to another part of Mexico to avoid the harm, *see* 8 C.F.R. § 1208.16(b)(2), and we conclude that substantial evidence does not compel a conclusion

to the contrary. *See* 8 U.S.C. § 1252(b)(4)(B); *N.L.A. v. Holder*, 744 F.3d 425, 430 (7th Cir. 2014) (stating standard of review). Determining whether an applicant can reasonably relocate is a two-pronged inquiry. First, it asks whether "the applicant could avoid a future threat … by relocating" within his home country and second, whether, "under all the circumstances, it would be reasonable to expect the applicant to do so." 8 C.F.R. § 1208.16(b)(2); *see Oryakhil v. Mukasey*, 528 F.3d 993, 998 (7th Cir. 2008). The second question depends on the totality of the circumstances, and 8 C.F.R. § 1208.16(b)(3) suggests several factors that may be relevant, including "whether the applicant would face other serious harm" in relocating, "geographical limitations," and "social and cultural constraints, such as age, gender, health, and social and familial ties."

In challenging this aspect of the Board's decision, Reyes-Mendez contends that the record shows that the Zetas control or have influence over large swathes of territory in Mexico, making safe relocation impossible. He suggests that the Board understated the scope of drug violence in Mexico by relying on an article that stated that the vast majority of gang-related murders in Mexico occur in just 7% of Mexico's towns. *See Under the Volcano: The drugs trade has spread corruption and violence across Mexico. Can the police ever catch up with them?*, THE ECONOMIST, Oct. 14, 2010, http://www.economist.com/node/17249102. The article itself stated that the statistics, which were provided by the Mexican government, are disputed. He also argues that the Board did not consider that, even though he is a resourceful and hardworking 28-year-old man, he has never lived apart from his family and his dependence on his family in Yecuatla would prevent him from living elsewhere in Mexico.

The record does not compel the conclusion that Reyes-Mendez could not avoid future persecution by relocating. Although the record shows that the Zetas have influence in many Mexican states, it does not show that their reach is absolute. One estimate in the record, from a BBC report, states that they have a presence in 19 of Mexico's 31 states, and another, from GEORGE W. GRAYSON, MEXICO: NARCO-VIOLENCE AND A FAILED STATE 181 (2010), suggests that they are active in Mexico City and in several states on the Gulf Coast and in the south.

Nor does the record compel the conclusion that it would be unreasonable to ask Reyes-Mendez to relocate. The Board properly concluded that, although Reyes-Mendez was close to his family, nothing suggested that he would be unable to live apart from them to avoid persecution. Mexico is a large country, and Reyes-Mendez is a single man, currently 32 years old, who has learned a skilled trade. He has not shown that he would encounter difficulty living alone in a different part of Mexico. *Cf. Cece*, 733 F.3d at 677–78

(concluding that applicant, a single woman, could not reasonably relocate and live alone in a small country in which "a young single woman living alone would stick out as an anomaly").

Reyes-Mendez's remaining two arguments also fail. First, he cannot succeed on his CAT claim because he points only to evidence that torture occurs in Mexico, not to anything that suggests he might be singled out for torture. *See Lenjinac v. Holder*, 780 F.3d 852, 855–56 (7th Cir. 2015) ("[R]eports that torture occurs in a foreign country … are insufficient … without evidence that the *petitioner* will be tortured if he returns."); *Jan v. Holder*, 576 F.3d 455, 458 (7th Cir. 2009). Second, the Board did not abuse its discretion when it declined to remand his case to the IJ for further factfinding after Reyes-Mendez attached five news articles to his brief before the BIA. None of the reports offer evidence regarding whether relocation would be impossible or unreasonable.

Accordingly, we DENY the petition.