In the

# United States Court of Appeals

### For the Seventh Circuit

―――――――――――

No. 16-4193

W.G.A.,

*Petitioner*,

*v.*

JEFFERSON B. SESSIONS III,
Attorney General of the United States,

*Respondent*.

―――――――――――

Petition for Review of an Order of the
Board of Immigration Appeals.
No. Axxx-xxx-xxx.

―――――――――――

ARGUED JANUARY 18, 2018 — DECIDED AUGUST 21, 2018

―――――――――――

Before SYKES and HAMILTON, *Circuit Judges*, and LEE, *District Judge*.[*]

HAMILTON, *Circuit Judge*. In 2015, tattooed members of the Mara 18 gang held a gun to petitioner W.G.A.'s head and

―――――――――――

[*] Of the Northern District of Illinois, sitting by designation.

threatened to kill him.[1] The Mara 18—also known as the "Calle 18," "Barrio 18," or "Eighteenth Street" gang—is one of the two main gangs operating in El Salvador. Together with their rivals, MS-13, the Mara 18 terrorize the Salvadoran population and government. The gangs use violence to exercise an enormous degree of social control over their territories, dictating where residents can walk, whom they can talk to, what they can wear, and when they must be inside their homes. The gangs have orchestrated labor strikes, brokered a now-defunct truce with the government, and plotted to bomb government buildings. They brag about influencing elections and controlling political campaigns within their territories. They extort millions of dollars from local businesses through threats of violence, and they are largely responsible for El Salvador's homicide rate—one of the highest in the world.[2] Two days after the Mara 18 threatened W.G.A., he fled to the United States.

The Department of Homeland Security apprehended W.G.A. for illegally entering the United States and began removal proceedings against him. W.G.A. applied for asylum,

---

[1] We refer to petitioner with an initialed pseudonym to protect his identity. See *Doe v. Gonzales*, 484 F.3d 445, 446 (7th Cir. 2007).

[2] According to a report in the record by the U.S. Department of State, the 2015 homicide rate in El Salvador was 103 murders per year for every 100,000 citizens. For context, Chicago has a murder rate of about 17.5 homicides per 100,000 inhabitants. Matthew Friedman, Ames Grawert & James Cullen, NYU School of Law Brennan Center for Justice, *Crime in 2016: Updated Analysis*, Table 2, p. 3 (data updated Dec. 19, 2016), available at http://www.brennancenter.org/analysis/crime-2016-updated-analysis. The State Department estimates that the national homicide rate in the United States is about 4.5 murders per year per 100,000 citizens.

statutory withholding of removal, and deferral of removal under Article 3 of the Convention Against Torture, arguing that the Mara 18 gang would kill him if he returned to El Salvador. The immigration judge denied his applications and ordered removal. The Board of Immigration Appeals dismissed W.G.A.'s appeal, and he petitions this court for review. We grant W.G.A.'s petition for review and remand to the Board for further proceedings consistent with this opinion.

I.   *Factual & Procedural Background*

W.G.A. is a citizen of El Salvador who arrived in the United States in January 2016. The immigration judge found W.G.A. credible, and the Board of Immigration Appeals affirmed that finding. We use W.G.A.'s testimony and the immigration judge's findings to provide the factual context in this case.

W.G.A. grew up in a small farming community of about 170 families. In 2013, the Mara 18 gang began operating in his rural community. By 2015 there were about 20 local gang members. The gang engaged in their usual activities: extorting *la renta*, or "rent," from local businesses, recruiting young men as new members, and "disappearing" (as a transitive verb) those who refused to join.

One day in 2014, petitioner's younger brother S.R.P. failed to return home from a trip to the store. Petitioner and his mother searched for S.R.P. When they could not find him, they guessed that the gang had forcibly recruited him. About two months later, S.R.P. called petitioner. He was crying and said that he did not know where he was and could not talk long because the gang might kill him. S.R.P. then hung up ab-

ruptly. Petitioner told his mother of the call, but neither contacted the police because they felt it would be useless. They had seen others in their community seek help from the police without success. Others had disappeared after reporting crimes to police.

A few months later, the family learned that S.R.P. had been arrested. Petitioner's mother attended a court proceeding, where she saw that S.R.P. had a gang tattoo on his hand. S.R.P. remained in prison until November 2015 when, on the day of his release, he called W.G.A. to say that he did not want to be a part of the gang anymore. S.R.P. said he could not come home for fear of what the gang would do, but he did not tell W.G.A. where he was going. W.G.A. assumed that his brother headed toward Guatemala.

The next day, a man called W.G.A. from a private number. The man told W.G.A. to "be careful" and that "they're looking for you," and hung up without identifying himself. The following day—two days after S.R.P. left prison—four tattooed gang members approached W.G.A. at his house. They asked him where his brother was. When W.G.A. responded that he did not know, one man grabbed him by the collar of his shirt, threw him to the ground, drew a gun, and put it to his head. One of the men told petitioner: "if you don't [hand] over your brother, you're going to die here."[3] The men told W.G.A. that he had four days to comply or they would kill him. They also told him that they would kill him and his family if anyone spoke to the police.

---

[3] The transcript reads: "if you don't have over your brother, you're going to die here." We read "have" as a typographical error.

Fearing for his life, W.G.A. fled two days later. He traveled through Guatemala and Mexico to the United States. Since W.G.A. left El Salvador, gang members have repeatedly threatened his family—over the phone and in person—to demand his and his brother's whereabouts. Petitioner's mother was so frightened by the threats that she arranged for her other teenage son, J.R.P., to go into hiding.

In January 2016, W.G.A. entered the United States through Texas without valid entry documents. The Department of Homeland Security initiated removal proceedings against him. See 8 C.F.R. § 1239.1. W.G.A. conceded that he was removable under 8 U.S.C. § 1182(a)(7)(A)(i)(I). He then applied for asylum under 8 U.S.C. § 1158, withholding of removal under 8 U.S.C. § 1231(b)(3), and deferral of removal under Article 3 of the Convention Against Torture, 8 C.F.R. §§ 1208.16(c), 1208.18.

The immigration judge concluded that W.G.A. did not qualify for any of his asserted grounds of relief and ordered removal. W.G.A. appealed to the Board of Immigration Appeals, which agreed with the immigration judge and dismissed W.G.A.'s appeal. The immigration judge's order of removal became final, see 8 C.F.R. § 1241.1(a), and W.G.A. petitioned for review in this court, see 8 U.S.C. § 1252(a)(1), (b)(1). While W.G.A.'s appeal was pending before the Board, DHS wrongfully removed him to El Salvador. See 8 C.F.R. § 1003.6(a) (staying execution of immigration decisions while appeal is pending). This removal did not affect the Board's or our jurisdiction. *Matter of Diaz-Garcia*, 25 I. & N. Dec. 794 (BIA 2012); *Marin-Rodriguez v. Holder*, 612 F.3d 591, 593–94 (7th Cir. 2010). We ordered briefing on whether we had the authority to order DHS to permit W.G.A. to return to the United States

while his appeal was pending. Rather than litigate the issue further, the government agreed to facilitate W.G.A.'s return. The parties have successfully returned W.G.A. to the United States, where he remains detained.

## II. *Scope of Review*

It is helpful to start by clarifying the scope of our review. The answer depends on whether the Board's order is independent of or supplemented the immigration judge's decision. See *Liu v. Ashcroft*, 380 F.3d 307, 311 (7th Cir. 2004). When the Board issues an independent opinion that replaces the immigration judge's reasoning with its own, our review is limited to the Board's opinion. *Jabateh v. Lynch*, 845 F.3d 332, 337 (7th Cir. 2017), citing *Sarhan v. Holder*, 658 F.3d 649, 653 (7th Cir. 2011). Our review is broader when the Board relies on the immigration judge's findings and supplements that opinion "with additional observations." *Sarhan*, 658 F.3d at 653. In those cases, we review the immigration judge's findings as supplemented by the Board's. *Id.*, citing *Mema v. Gonzales*, 474 F.3d 412, 416 (7th Cir. 2007). In a footnote, W.G.A. states that our review is limited to the Board's opinion. The Attorney General argues that the Board's order was supplementary to the immigration judge's decision. We agree with the Attorney General's reading and see no reason in this case to narrow our review.

## III. *Asylum and Withholding of Removal*

To qualify for asylum, W.G.A. must show that he is "unable or unwilling to return" to El Salvador "because of persecution or a well-founded fear of persecution." 8 U.S.C. §§ 1158(b)(1)(A), 1101(a)(42)(A). The persecution must be "on

account of" one of five protected grounds: "race, religion, nationality, membership in a particular social group, or political opinion." § 1101(a)(42)(A). If W.G.A. proves that he was persecuted in the past because of one or more of the protected grounds, he is presumed to have a well-founded fear of future persecution on the same grounds. 8 C.F.R. § 1208.13(b)(1). The Attorney General can rebut that presumption by showing that country conditions have changed or that W.G.A. can safely relocate to another part of El Salvador. § 1208.13(b)(1), (b)(1)(i). Withholding of removal is similar. The Attorney General must withhold removal of W.G.A. if his "life or freedom would be threatened in" El Salvador because of one of the same five protected grounds. 8 U.S.C. § 1231(b)(3)(A). If he shows past persecution, W.G.A. is again entitled to a rebuttable presumption that his life or freedom would be threatened. 8 C.F.R. § 1208.16(b)(1)(i).

W.G.A. has shown past persecution. He testified, and the immigration judge credited his testimony, that the Mara 18 threatened his life at gunpoint. That point is not in dispute in this case. The Board found that the threat amounted to persecution. See *Nakibuka v. Gonzales*, 421 F.3d 473, 477 (7th Cir. 2005) ("A death threat, especially one that is accompanied by an attacker pressing a gun to the victim's head, is a serious factor supporting a finding of persecution."), citing *Boykov v. INS*, 109 F.3d 413, 416 (7th Cir. 1997), and *Mitev v. INS*, 67 F.3d 1325, 1331 (7th Cir. 1995).

The first disputed issue is whether the persecution was motivated by a reason covered by the asylum statutes. W.G.A. contends that the gang was motivated by his membership in one of two particular social groups: (1) members of his nu-

clear family or (2) family members of tattooed former Salvadoran gang members. The immigration judge and the Board found that this persecution was not sufficiently connected to W.G.A.'s membership in a particular social group. We decide the issue by addressing two questions: (1) whether W.G.A. has shown that he is a member of a qualifying social group; and (2) whether he has shown that the Mara 18 persecuted him on account of his membership in that group. We agree with W.G.A. that he has identified a cognizable social group and that the record compels the conclusion that the Mara 18 persecuted him on account of his membership in it.

A. *General Remand*

We first address the Attorney General's request for a general remand. The Attorney General made no substantive arguments related to asylum or withholding of removal in this appeal. Instead, he requests that we remand to the Board for reconsideration without engaging in any review ourselves.

In some past cases, we have allowed the Attorney General to seek a remand without confessing error so that the Board can reconsider asylum decisions "in light of the emerging case law." *Ren v. Gonzales*, 440 F.3d 446, 448 (7th Cir. 2006). In some cases where we have accommodated these requests, we have been disappointed: the Board has disregarded the Attorney General's stated reasons for remand. See, e.g. *Reyes-Mendez v. Lynch*, 629 Fed. App'x 757, 761 (7th Cir. 2015) (criticizing Board for repeating "its social-group analysis word for word" after the Attorney General requested general remand for Board to reconsider social-group analysis); see also *Marin-Rodriguez v. Holder*, 612 F.3d 591, 595–96 (7th Cir. 2010) (rejecting Attorney General's request for a general remand for Board to reconsider merits, when Board's position was that it

did not have jurisdiction to consider merits). In light of these cases, we will grant a general remand only when there is a persuasive reason to do so, at least where, as here, the request is opposed by the petitioner.

The Attorney General offers two reasons for a general remand. First, he requests that the Board have a chance to reconsider whether "family members of tattooed former Salvadoran gang members" is cognizable in light of circuit and Board precedents that predate this case. The Attorney General does not explain why the Board needs a second chance to apply case law that was available when it decided W.G.A.'s appeal, and we decline to remand on that basis.

Second, the Attorney General seeks a remand to permit the Board to consider *Matter of L-E-A-*, 27 I. & N. Dec. 40 (BIA 2017) (requiring petitioner to demonstrate that family relationship is at least one central reason for persecution). The Board issued *L-E-A-* after it dismissed W.G.A.'s appeal, and the Attorney General argues that *L-E-A-* provides "critical guidance" for cases that involve "family-based particular social groups." But *L-E-A-* did not establish a new rule. As the government agreed at oral argument, *L-E-A-* applied the same analysis that the Board has followed since at least 2007. See *In re J-B-N- & S-M-*, 24 I. & N. Dec. 208, 212–16 (BIA 2007) (interpreting the "one central reason" requirement for asylum). In this case, the immigration judge applied the already-established rules summarized in *L-E-A-* and found that social-group membership was not a central motivation for the Mara 18. We decline to remand on this basis as well.

B.  *Cognizable Social Group*

The first substantive question is whether W.G.A. is a member of a particular social group within the meaning of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42)(A). Whether a group qualifies as a "particular social group" is a question of law that we review *de novo*, though we give *Chevron* deference to the Board's "reasonable interpretation set forth in precedential opinions." *Cece v. Holder*, 733 F.3d 662, 668–69 (7th Cir. 2013) (en banc), citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43 (1984).

In *Matter of Acosta*, the Board interpreted "membership in a particular social group" to mean "an individual who is a member of a group of persons all of whom share a common, immutable characteristic." 19 I. & N. Dec. 211, 233 (BIA 1985), overruled, in part, on other grounds by *Matter of Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987). The Board defined "immutable characteristic" to mean a characteristic "that either is beyond the power of an individual to change or that is so fundamental to his identity or conscience that it ought not be required to be changed." *Id.* "Particular social group" is an ambiguous phrase, and we have deferred to the Board's interpretation in *Acosta*. *Cece*, 733 F.3d at 669, citing *Lwin v. INS*, 144 F.3d 505, 511 (7th Cir. 1998).

In the decades since *Acosta*, the Board has added social distinction (also called social visibility) and particularity as two requirements in addition to the immutable-characteristic test. See, e.g., *In re C-A-*, 23 I. & N. Dec. 951, 957, 959 (BIA 2006). These two requirements are at issue here. W.G.A. proposed two social groups as the basis for asylum and withholding of removal: (1) members of his nuclear family; and (2) family members of tattooed former Salvadoran gang members. The

Board and immigration judge accepted the first but rejected the second as overbroad and not "a socially distinct group within El Salvador."

W.G.A. correctly points out that we have not yet accorded *Chevron* deference to the Board's interpretation that includes social distinction and particularity. He also cites several cases in which we have disapproved—sometimes strongly—of these two requirements. See, e.g., *N.L.A. v. Holder*, 744 F.3d 425, 438 (7th Cir. 2014) ("[I]t would be antithetical to asylum law to deny refuge to a group of persecuted individuals who have valid claims merely because too many have valid claims."); *Gatimi v. Holder*, 578 F.3d 611, 615–617 (7th Cir. 2009) (rejecting social distinction because "it makes no sense" given examples of previously recognized particular social groups). Those cases, however, either predate or fail to address intervening Board opinions that engage in statutory interpretation and explain the Board's reasoning. See *Matter of M-E-V-G-*, 26 I. & N. Dec. 227 (BIA 2014); *Matter of W-G-R-*, 26 I. & N. Dec. 208 (BIA 2014); see also *Gatimi*, 578 F.3d at 615 (rejecting social distinction and particularity in part because Board failed to explain its reasoning "in this or any other case"). Whether the Board's particularity and social distinction requirements are entitled to *Chevron* deference remains an open question in this circuit.[4]

---

[4] W.G.A.'s arguments that the Board's interpretation is unreasonable have some force. He argues that social distinction and particularity create a conceptual trap that is difficult, if not impossible, to navigate. The applicant must identify a group that is broad enough that the society as a whole recognizes it, but not so broad that it fails particularity. And as we have stated, rejecting a social group because it is too broad "would be akin to saying that the victims of widespread governmental ethnic cleansing cannot receive asylum simply because there are too many of them." *N.L.A.*,

We decline to make the *Chevron* determination in this case, where the government has chosen not to make any substantive arguments on the issue and there are alternative grounds for decision. The Board and immigration judge agreed that W.G.A.'s second proposed group—membership in his nuclear family—is cognizable. See *Torres v. Mukasey*, 551 F.3d 616, 629 (7th Cir. 2008) ("Our prior opinions make it clear that we consider family to be a cognizable social group."), citing *Iliev v. INS*, 127 F.3d 638, 642 & n.4 (7th Cir. 1997). Because we find that the record compels the conclusion that W.G.A. was persecuted on account of his membership in his nuclear family, we need not resolve the *Chevron* question regarding the family members of former gang members.

C. *Nexus to Persecution*

Next, W.G.A. challenges the Board's finding that he was not persecuted "on account of" his membership in his family. Whether W.G.A. met this burden is a question of fact that we review for substantial evidence. *Martinez-Buendia v. Holder*, 616 F.3d 711, 715 (7th Cir. 2010), citing *Mabasa v. Gonzales*, 455 F.3d 740, 744 (7th Cir. 2006). We may reverse "only if we determine that the evidence compels a different result." *Cece*, 733 F.3d at 675–76, quoting *FH-T v. Holder*, 723 F.3d 833, 838 (7th Cir. 2013); see also 8 U.S.C. § 1252(b)(4)(B).

To be eligible for asylum, W.G.A. must show that he was persecuted "on account of" his social-group membership. 8

---

744 F.3d at 438, citing *Cece*, 733 F.3d at 675. W.G.A. also claims that in the decade since the Board introduced social distinction and particularity, it has approved only one new particular social group. The Board has not responded to this troubling assertion.

U.S.C. §§ 1158(b)(1)(A)–(B)(i), 1101(a)(42)(A). In 2005, Congress clarified that the protected ground must be "at least one central reason" for the persecution. See REAL ID Act of 2005, Pub L. No. 109–13, § 101(a)(3), 119 Stat. 302, 303 (2005), codified at 8 U.S.C. § 1158(b)(1)(B). The protected trait does not have to be the only reason for the persecution, but it "cannot play a minor role." *L-E-A-*, 27 I. & N. Dec. at 44, quoting *J-B-N- & S-M-*, 24 I. & N. Dec. at 214. Different language governs eligibility for withholding of removal. Congress has not amended the sections governing withholding to include the "one central reason" language. Compare 8 U.S.C. § 1158(b)(1)(B)(i) with 8 U.S.C. § 1231(b)(3)(A).

To start, in W.G.A.'s case, the Board stated the wrong legal standard for withholding of removal. Confusingly, the Board reasoned that because "the respondent did not establish the lower burden of proof applicable to asylum, he necessarily did not establish his eligibility for withholding of removal, which carries a higher burden of proof." This is not quite correct. Withholding of removal carries a higher burden on two questions: the *severity* of the harm the applicant faces (persecution versus threat to life or freedom) and the *likelihood* that the applicant will be harmed (well-founded fear versus clear probability). See *Matter of H-L-H- & Z-Y-Z-*, 25 I. & N. Dec. 209, 218 (BIA 2010) (reasoning that applicant who failed to show fear of persecution necessarily had not shown a threat to life or freedom); *Toptchev v. INS*, 295 F.3d 714, 720 (7th Cir. 2002) (reasoning that applicant who failed to show a well-founded fear necessarily had not shown clear probability). The nexus requirement, however, is the same for both asylum and withholding of removal. At least, that's the position the Board has taken in other cases. See, e.g., *Matter of C-T-L-*, 25 I.

& N. Dec. 341, 343 (BIA 2010).[5] Because W.G.A. does not argue that different standards should govern the two claims, we apply the "one central reason" standard throughout our analysis.

Returning to the merits, this record compels the conclusion that W.G.A.'s membership in his nuclear family was one central reason for the persecution that both sides agree he suffered. Testimony by W.G.A. and his family members leaves no doubt that the gang repeatedly targeted the entire family because of their relationship to S.R.P. Country reports and news articles throughout the record corroborate this testimony and demonstrate widespread recognition that the Salvadoran gangs target nuclear family units to enforce their orders and to discourage defection. In other words, substantial evidence does not support the immigration judge's finding on the lack of a nexus between the gang's persecution of W.G.A. and his membership in the family.

To start, the timing of the persecution demonstrates that W.G.A.'s family relationship with his brother caused the gang to target W.G.A. The gang members threatened W.G.A. at gunpoint just two days after S.R.P. said he was defecting. The immigration judge and Board doubted whether S.R.P. had actually defected, but that detail is unimportant. What matters is that the gang was looking for S.R.P., likely because they believed he had defected. What's more, the gang's own words reveal their motivation. When the gang held a gun to W.G.A.'s

---

[5] The Ninth Circuit has recently held that position unreasonable and not entitled to *Chevron* deference. See *Barajas-Romero v. Lynch*, 846 F.3d 351, 360 (9th Cir. 2017).

head, they demanded that W.G.A. reveal his brother's location. And when the gang warned W.G.A. not to notify the police, they threatened to kill his entire family.

W.G.A. also provided examples from his community as circumstantial evidence of the gang's motivation. See *Martinez-Buendia*, 616 F.3d at 715 (applicant can prove motivation by direct or circumstantial evidence), citing *INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992). W.G.A. testified that when a young man he knew reported a robbery to the police, gang members "disappeared" him and his father in retaliation. W.G.A.'s mother submitted an affidavit that described a young woman in the community who refused requests to become a "gang member's woman." In response, the gang disappeared her and her brother. These anecdotes are analogous to W.G.A.'s situation: S.R.P. crossed the gang, and they retaliated by targeting his nuclear family.

Country reports and news articles corroborate this testimony. A report by the U.S. Department of State says that "the families of gang members often face the same risks of being killed or disappearing as the gang members themselves." R. 290. The United Nations also reports that family members can "also be a target for attacks and assassination by gangs, sometimes even after the person who was initially targeted by the gang in question has fled or has already been killed." R. 368. One news article describes a woman who went into hiding after the gang accused her husband of talking to police. R. 477–78. Another describes a man who rescued his daughter after gang members abducted and raped her. As retribution, the gang shot and killed the man's wife. R. 463. These reports are only a few examples. We see nothing in the record that

calls into question W.G.A.'s claim that he was targeted because of his family membership.

Despite the extensive record, the Board adopted the immigration judge's conclusion that W.G.A. had not shown a sufficient nexus because other family members continue to live in El Salvador unharmed. This is factually inaccurate. W.G.A., his mother, and his sister described how the gang continued to target the family. W.G.A.'s mother reported that she had received at least four threatening phone calls from "angry," yelling gang members and that the calls continued until she threw her cell-phone chip away. W.G.A.'s mother and sister described how masked gang members have appeared at their home at least twice, threatening them and demanding to know where S.R.P. and W.G.A. were. We cannot accept the immigration judge's conclusion that threatening phone calls and home invasion by masked gang members are not evidence that other family members have been harmed. Plus, as the government correctly acknowledged in oral argument, it was improper for the immigration judge to rely on a lack of harm to other family members, without more, to find that W.G.A. was not targeted on account of his kinship ties. See *R.R.D. v. Holder*, 746 F.3d 807, 809 (7th Cir. 2014) (reasoning that statute "does not require that all members of" the protected group "suffer the same fate"); see also *Cordova v. Holder*, 759 F.3d 332, 339 (4th Cir. 2014) (refusing to uphold Board's reasoning that petitioner could not have been targeted on account of his kinship ties because other family members were not targeted for same reason).

The immigration judge also relied on W.G.A.'s testimony that the gang has a personal vendetta against him. But that testimony does not actually support the immigration judge's

finding. On cross-examination, the government's lawyer asked W.G.A. if the "gangs just have a … personal vendetta against you." W.G.A. responded affirmatively. But this question does not contradict the overwhelming record evidence that the gang targeted W.G.A. because of his familial relationship to S.R.P. The government did not ask W.G.A. *why* the gang had a personal vendetta against him, and the most plausible answer is because he is related to S.R.P. The record suggests only one other potential motive for the persecution. W.G.A. testified that, in 2014, members of the gang asked him to do favors for the gang and he refused. Even if W.G.A.'s refusal to help the gang in 2014 influenced the gang's decision to target him in 2015, that one fact does not undermine the overwhelming evidence showing that W.G.A.'s familial ties were one central reason for his persecution.

Finally, the immigration judge also improperly stressed that W.G.A.'s parents and seven siblings remain in El Salvador. This is true, although the family is so fearful that they sent their other teenage son, J.R.P., into hiding. This is not evidence of a safe family. Additionally, the fact that some family members have not relocated within El Salvador has little force in light of the rest of the record. Country reports describe how relocation is difficult and often dangerous: the choice is between remaining in the Mara 18's territory and risking retribution, or relocating to the rival gang's territory and being killed by them. A United Nations report estimates that 600,000 to 700,000 Salvadorans—or 10% of the population—are affiliated with the gangs and act as lookouts in the gangs' territories. R. 338. The record describes various incidents when gangs killed non-members who had crossed gang boundaries for innocent reasons like visiting a family member or walking to school. R. 338, 470, 547. And W.G.A. testified

about a community member who went to work at a business in MS-13 territory and who, upon arrival, was asked to identify himself and where he came from. When he revealed that he lived in Mara 18 territory, the questioner told him he would be killed if he entered MS-13 territory again. Once again, W.G.A.'s testimony corroborates the indirect evidence in the record. It means little, therefore, that W.G.A.'s family has not sought to move elsewhere to avoid threats.

IV. *Convention Against Torture*

As a third ground for relief, W.G.A. seeks to defer removal under Article 3 of the Convention Against Torture. W.G.A. bears the burden of showing "that it is more likely than not that he … would be tortured if removed" to El Salvador. 8 C.F.R. § 1208.16(c)(2). Recognizing that precise probabilities are difficult to prove and assess, we have interpreted this language to mean a "substantial risk that a given alien will be tortured if removed from the United States." *Rodriguez-Molinero v. Lynch*, 808 F.3d 1134, 1135–36 (7th Cir. 2015). Unlike asylum and statutory withholding of removal, W.G.A. does not have to show that the torture relates to any protected grounds. But the torture must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official." 8 C.F.R. § 1208.18(a)(1).

W.G.A. argues that a remand is necessary because the Board and immigration judge applied the wrong legal standard and ignored key evidence. We agree. Neither the immigration judge nor the Board considered W.G.A.'s key evidence that he would likely be tortured in El Salvador. The agency must consider "all evidence relevant to the possibility of future torture," 8 C.F.R. § 1208.16(c)(3), and must "announce its decision in terms sufficient to enable a reviewing

court to perceive that it has heard and thought and not merely reacted." *Ferreira v. Lynch*, 831 F.3d 803, 810 (7th Cir. 2016), quoting *Solis-Chavez v. Holder*, 662 F.3d 462, 469 (7th Cir. 2011). Together, the Board and immigration judge considered only that W.G.A. had not been tortured in the past and that his family remained in El Salvador unharmed. Neither considered that the gang continues to threaten W.G.A.'s family and raid their house looking for him. Nor did they consider the strongest evidence of the risk of torture: that masked gang members raided the house of a close family friend at night and, when they found him there, murdered and dismembered him for disobeying their orders.[6]

The Board also applied the wrong legal standard when it found that W.G.A. had not shown government acquiescence. The Board stated that W.G.A. had "not indicated that there was any involvement of a public official" in "any of the threats directed" at him. W.G.A. does not need to show that a public official was involved directly. *Sarhan*, 658 F.3d at 657–58. Perhaps for this reason, the immigration judge and Board ignored key evidence on this point too. They did not address the extensive record that describes how corruption, judges' refusal to protect witness anonymity, and the police's fear of reprisal all allow gangs to act with a high degree of impunity. And when the agency found that the police arrested S.R.P. twice for gang activity—and therefore do not acquiesce to any torture—the agency failed to consider the evidence that gang

---

[6] The briefs misread what the record says about the gang's motivation for this murder. W.G.A. testified that on that night, the gang was out looking for the friend, W.G.A., and S.R.P. W.G.A.'s sister and mother both said that the gang murdered the family friend because he refused to join them and collect extortion on their behalf.

members continue to operate from within prisons. For these reasons, we also remand W.G.A.'s claim for deferred removal under the Convention Against Torture.

*Conclusion*

We remand to the Board for further proceedings consistent with this opinion. On remand, the Board must also consider two issues that we do not discuss. First, the Board must consider the immigration judge's finding that W.G.A. would be able to relocate within El Salvador. Because the immigration judge incorrectly found that W.G.A. had not been persecuted in the past, the judge applied the wrong burden on the question of relocation. See 8 C.F.R. §§ 1208.13(b)(1)(ii), 1208.16(b)(1)(ii) (placing burden on government to rebut presumption when applicant shows past persecution). Second, the Board must review the immigration judge's findings that the Salvadoran government is not unable or unwilling to prevent the persecution. See, e.g., *Pramatarov v. Gonzales*, 454 F.3d 764, 766 (7th Cir. 2006), citing *Hor v. Gonzales*, 421 F.3d 497, 501–02 (7th Cir. 2005). These issues remain open and require reconsideration on remand.

We therefore GRANT the petition for review and REMAND the case to the agency for further proceedings consistent with this opinion.