In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 18-2337

MAURICIO GONZALEZ RUANO,

*Petitioner*,

*v.*

WILLIAM P. BARR,
Attorney General of the United States,

*Respondent*.

_____

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A200-901-276.

_____

ARGUED MARCH 29, 2019 — DECIDED APRIL 24, 2019

_____

Before HAMILTON, BARRETT, and ST. EVE, *Circuit Judges*.

HAMILTON, *Circuit Judge*. In September 2016, members of a Mexican drug cartel kidnapped, tortured, and threatened to kill petitioner Mauricio Gonzalez Ruano, who was living with his family in the Mexican state of Jalisco. The cartel uses brutal violence to terrorize communities throughout Mexico and exercises influence at all levels of the Mexican government in furtherance of its criminal objectives.

Gonzalez Ruano's persecution began after he refused to allow the local cartel leader to "possess" his wife, as the record puts the point euphemistically. As we explain below, Gonzalez Ruano and his wife tried to find a way to continue living safely in Mexico. Their attempts failed, in shockingly brutal ways. On the advice of a Mexican prosecutor, Gonzalez Ruano and his wife and two children then fled to the United States. The couple surrendered themselves at the border. Gonzalez Ruano applied for asylum, withholding of removal, and protection under the Convention Against Torture.

An immigration judge found that Gonzalez Ruano was credible and that he would likely be tortured if he returned to Mexico. The judge therefore granted relief under the Convention Against Torture. The judge denied his petition for asylum, however, on the ground that Gonzalez Ruano did not show a nexus between his persecution and membership in a "particular social group," which is one path toward asylum in the United States. The Board of Immigration Appeals agreed with the judge. Gonzalez Ruano has petitioned this court for review. We find that the record here compels a finding that the torture and persecution Gonzalez Ruano has suffered in the past and fears in the future were and would be because of his membership in the "particular social group" of his wife's family. Gonzalez Ruano thus demonstrated statutory eligibility for asylum in the United States. We GRANT his petition for review and REMAND the case to the Board for further proceedings consistent with this opinion.

I.  *Facts & Procedural History*

   A.  *Cartel Violence in Jalisco*

Based on the immigration judge's unchallenged finding
that petitioner was credible, we rely on his unrebutted testi-
mony and the judge's findings to lay out the relevant facts.
Before fleeing his home, Gonzalez Ruano lived in the state of
Jalisco, Mexico, with his wife and their two sons. Jalisco is the
home of a ruthless drug cartel known as the Cartel de Jalisco
Nueva Generación or CJNG. In the last decade, the CJNG has
expanded its operations throughout Mexico. It is infamous for
routinely using brutality.  The cartel operates under the creed
"plata o plomo"—silver or lead—meaning it uses bribery or
brutal violence to coerce compliance with its demands.

Dr. Everard Meade testified as an expert witness for Gon-
zalez Ruano at the hearing on his applications. Dr. Meade ex-
plained: "those who've tried to stand up to [the CJNG] have
been mercilessly targeted and kidnapped, tortured and mur-
dered and in some cases, forcibly disappeared. There are
many others who have co-existed with them through some
form of cooptation. Sometimes this is about greed . . . most
cases, however, it's as much about fear and coercion as it is
about greed."

Regarding the cartel's widespread influence, Dr. Meade
testified that CJNG is

> involved in weapons smuggling, money laun-
> dering, human smuggling, human trafficking,
> financial fraud. . . . [T]hey're involved in various
> kinds of assassinations for hire, which are ad-
> junct to political corruption. In other words,
> they're involved in the full panoply of illegal

> activities in Mexico and this . . . expansion of the portfolio has increased exponentially since 2009, to the point that . . . selling illicit drugs in the United States is not even their largest business anymore.

He also explained that the "impunity rate"—the percentage of homicides for which no suspect is detained or charged—in Mexico is a shocking 98–99%. He also provided examples to show how the Mexican government is unable to protect citizens from CJNG as a result of its methods and widespread influence.

B.  *CJNG Targets Gonzalez Ruano*

Despite living in CJNG territory, Gonzalez Ruano did not experience any major problems from the cartel before September 2016. He ran a small shop selling eggs. His wife, Catalina Carbajal de Gonzalez, sold clothes at a separate store. Both of their children, who attended school in Jalisco, had been born in the United States when the couple had been living legally in California. Gonzalez Ruano and Catalina had close relationships with their extended family living in Jalisco. As of 2016, they had been living in the same house for fifteen years. Before the events that forced him to seek asylum, Gonzalez Ruano had no plans to relocate to the United States.

Gonzalez Ruano was working in his shop in September 2016 when three men he did not know entered the store. He later learned that one of the men was the local leader of the CJNG named Francisco Rivera. Rivera approached Gonzalez Ruano, grabbed him by the throat, and pointed a gun at his neck. He told Gonzalez Ruano that his wife, Catalina, now belonged to him, Rivera. While still gripping his throat and

holding the gun to his neck, Rivera told Gonzalez Ruano that he knew the names of his children, his daily routine, and where Catalina worked. Rivera told Gonzalez Ruano that he had to leave Catalina and his home or else he would be killed. Stunned, Gonzalez Ruano was unable to speak. The men left when another customer entered the store. Gonzalez Ruano immediately called his wife to tell her what happened.

That night, Gonzalez Ruano asked Catalina if she knew anything about the men who threatened him. She broke down in tears. She told him that Rivera had been threatening her for some time in person and over the phone, and that he had "ordered" her to leave Gonzalez Ruano because she was now Rivera's "property" and had to work for the CJNG.

Three days later, the same men came back to Gonzalez Ruano's store. Rivera walked up to Gonzalez Ruano, again held a gun to him, and asked whether he understood the situation. Rivera again said that Catalina belonged to him and that he would kill Gonzalez Ruano if he did not leave his wife. As the men left, they yelled threats about what would happen to Gonzalez Ruano if he did not leave Catalina.

Gonzalez Ruano was terrified. He immediately closed his shop and went home. Catalina was already there, and he told her about the encounter. She began sobbing. She told him that the day after Rivera had made the first threatening visit to Gonzalez Ruano's shop, Rivera had kidnapped her and raped her. In her affidavit, Catalina explained that Rivera and three men approached her as she was getting into her car. The men forced her into a van and took her to a hotel where Rivera raped her. Before taking her back to her car, Rivera again said that she belonged to him. He again ordered her to leave Gonzalez Ruano, and he threatened to kill him if she refused.

The couple decided they had no choice but to leave. They immediately prepared to flee their hometown. They worked to wrap up loose ends, such as collecting their sons' school records, obtaining new passports, and selling a car so that they would have enough money to flee.

C. *The Kidnapping*

Gonzalez Ruano found a buyer for their extra car in a nearby town. On his way to make the exchange, Gonzalez Ruano realized that he was being followed. When he stopped at a traffic light, the car that had been following him pulled alongside. A man in the car waved a gun to signal him to pull over. When the light changed, the other car pulled in front and blocked the road. When Gonzalez Ruano also stopped, two men got out of their car and forced him at gunpoint into their back seat.

Gonzalez Ruano managed to conceal his cell phone for a few minutes, giving him time to send a covert message telling Catalina he was being kidnapped and asking her to take care of their sons. Then one of the men in the car noticed Gonzalez Ruano sending text messages. He grabbed the telephone and took it apart. He then put a bag over Gonzalez Ruano's head to blind him.

After driving for approximately one hour, the men stopped and took Gonzalez Ruano out of the car without removing the bag from his head. They led him into a house and then removed his boots and took his wallet, saying he would not need them anymore. They forced him to stand against a wall. Gonzalez Ruano could see the floor from under the bag placed on his head, and he saw the feet of at least two other men in the room with him. After standing for several hours,

Gonzalez Ruano heard what sounded like a chair being moved across the floor and the footsteps of people entering the room. The bag was not removed from his head during these events.

Gonzalez Ruano described in gruesome detail what happened next: the beheading of two men as he was forced to remain standing against the wall. Beneath the edge of the bag over his head, he could see the head of one victim roll to his feet. After the second murder, Gonzalez Ruano heard someone say, "next one." The men who presumably committed the murders forced him to sit in a chair. Someone placed a thin metal wire around his neck and began to tighten it, causing excruciating pain.

Certain he was about to be beheaded, Gonzalez Ruano blurted out, "May God bless you, I know it is not your fault." This prompted another man, whose presence Gonzalez Ruano had been unaware of, to stop the imminent murder. The men began arguing whether to kill Gonzalez Ruano. They abruptly threw him on top of the bodies of the other victims and left. The men left him there all night, on top of the corpses, with the bag over his head and the wire still around his neck.

The next morning, the kidnappers returned. Again they argued about what to do with him. Without explanation, one of them grabbed Gonzalez Ruano and put him in a car. After driving a while, the car stopped and Gonzalez Ruano was pushed out. Before the car drove away, one of the kidnappers yelled, "Remember what you need to do, you son of a bitch." Gonzalez Ruano finally managed to remove the bag from his head, and he walked until he reached a store. His bare feet blistered from walking on the hot pavement, his neck had visible injuries from the wire, and he was covered in the blood of

the two murdered men. People were reluctant to help him. They realized he had been targeted by the cartel. He finally convinced someone at the store to let him use a telephone, and he contacted his wife and son to pick him up.

D. *Flight from Mexico to Seek Asylum*

Gonzalez Ruano and Catalina immediately packed suitcases and fled with their two sons early the next morning. They sought help from Gonzalez Ruano's sister in a nearby city. On the way to her house, the family noticed a truck was following them, but Gonzalez Ruano was able to evade the truck by abruptly leaving the highway. His sister allowed them to stay in another house she owned.

The next day, Gonzalez Ruano began reaching out to different attorneys for help in reporting the crimes CJNG committed against him and his family. Each attorney he contacted refused to take his case or told him that the cartel would not be prosecuted or would face only small monetary fines.

Finally, one attorney helped him contact a local prosecutor he trusted in Jalisco. The prosecutor told Gonzalez Ruano that the CJNG had infiltrated the law enforcement agencies in the state. He also told Gonzalez Ruano that he could not guarantee his safety if he stayed in Mexico and that his only option was to flee.

Gonzalez Ruano acted quickly on the prosecutor's advice. He sought expedited passports for himself and his family. Two days after they received their passports, Gonzalez Ruano and his family arrived in Tijuana. Once they reached the United States border, a family member took custody of the boys while Gonzalez Ruano and Catalina presented themselves for inspection. Gonzalez Ruano petitioned for asylum

under 8 U.S.C. § 1158(b)(1)(A), withholding of removal under 8 U.S.C. § 1231(b)(3)(A), and protection under the Convention Against Torture, 8 C.F.R. §§ 1208.16–1208.18.

In February 2017, Catalina received a call from Rivera, of the CJNG. He told her he was surprised that she and her family had reached the United States without his knowledge, and he warned her that he would be notified if they returned to Mexico. Family members of Gonzalez Ruano and Catalina have also reported that since they fled, strangers have been looking for Gonzalez Ruano. Within five months after their flight, his sister was approached approximately twenty times by young men she does not know, all asking where he was.

At his asylum hearing, Gonzalez Ruano introduced evidence to corroborate his story and establish his credibility, including affidavits from family members and news articles. He also called Dr. Everard Meade as an expert to testify about the CJNG generally and how country conditions in Mexico affected Gonzalez Ruano and his family. Dr. Meade explained that because of how CJNG has infiltrated Mexican agencies at multiple levels, the CJNG would quickly learn of Gonzalez Ruano's return to Mexico if he were removed from the United States.

The immigration judge found that Gonzalez Ruano's testimony and evidence were consistent and credible. The judge granted relief under the Convention Against Torture, finding it was more likely than not that if Gonzalez Ruano were returned to Mexico, the CJNG would locate him and torture him again. (The government has not appealed the relief under the Convention Against Torture, but that relief does not open a path to U.S. citizenship for Gonzalez Ruano.)

Immigration law distinguishes between torture and persecution. The judge found that Gonzalez Ruano's "experiences in Mexico—the past threats, the kidnapping, and witnessing two murders—do constitute past torture," and that he had a credible fear of future torture if he were returned to Mexico. Thus the grant of relief under the Convention. Nevertheless, the immigration judge denied his application for asylum. The judge reasoned that Gonzalez Ruano did not demonstrate a nexus between persecution and his membership in a particular social group. That meant he could not establish a well-founded fear of "persecution" as required by 8 U.S.C. § 1158(b)(1)(B)(i). Instead, the judge found that "the record supports the conclusion that [Rivera]. . . desired Catalina and personal animosity against the respondent for refusing to follow [Rivera's] directives motivated CJNG's action against [Gonzalez Ruano], which cannot support a nexus finding."

Gonzalez Ruano appealed, and the Board of Immigration Appeals affirmed. He now petitions for review, arguing that the immigration judge erred in denying asylum. He argues that he demonstrated a nexus between the past persecution (and feared future persecution) and his membership in a cognizable "particular social group." We agree.

II. *Analysis*

To be eligible for asylum, Gonzalez Ruano must show he was "unable or unwilling" to return to Mexico "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A). One of these five protected grounds must be "at least one central reason" for the persecution. § 1158(b)(1)(B); *W.G.A. v. Sessions*, 900 F.3d 957, 965 (7th Cir. 2018). Proof of

past persecution on one of these protected grounds triggers a presumption of a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1).

The government does not contest the immigration judge's findings that Gonzalez Ruano is credible or that he is eligible for protection under the Convention Against Torture. The issue before us is whether he established a nexus between his persecution and his membership in a cognizable social group.

A. *Scope of Review*

The scope of our review depends on whether the Board's order was free-standing or "merely supplementing" the immigration judge's opinion. *Moab v. Gonzales*, 500 F.3d 656, 659 (7th Cir. 2007). "Typically, when the BIA issues a decision, that decision becomes the basis for review," and we are limited to reviewing only the Board's decision. *Id.* When the Board's decision is not independent of the immigration judge's opinion, however, "we review the immigration judge's findings as supplemented by the Board's." *W.G.A.*, 900 F.3d at 962. In this case, the Board did not expressly or implicitly adopt the immigration judge's findings and did not issue its opinion wholly independent of the one issued by the immigration judge. We therefore review the immigration judge's findings as supplemented by the Board's.

B. *Cognizable Social Group*

On judicial review, Gonzalez Ruano argues that he was persecuted because of membership in two social groups as a basis for asylum and withholding of removal: (1) members of his immediate family; and (2) Mexican individuals who have refused to follow CJNG orders. Quoting our decision in *Cece v. Holder*, 733 F.3d 662, 671 (7th Cir. 2013) (en banc), the

immigration judge rejected the second proposed group, writing that a social group cannot be defined merely by the fact of persecution or solely by the shared characteristic of facing dangers in retaliation for actions they took against alleged persecutors. As for the first group, after hearing Gonzalez Ruano's testimony, the immigration judge construed the proposed social group "to mean the immediate family of Catalina."

The government does not challenge the judge's finding that Gonzalez Ruano is a member of a qualifying "particular social group," comprised of his wife's immediate family, within the meaning of § 1101(a)(42)(A). We and other circuits have recognized that membership in a nuclear family can satisfy the social group requirement. *W.G.A.*, 900 F.3d at 964 (siblings); *Torres v. Mukasey*, 551 F.3d 616, 629 (7th Cir. 2008) (same); see also, *Cruz v. Sessions*, 853 F.3d 122, 130 (4th Cir. 2017) (husband, wife, and two children); *Jie Lin v. Ashcroft*, 377 F.3d 1014, 1028 (9th Cir. 2004) (parents and one child); *Gebremichael v. I.N.S.*, 10 F.3d 28, 36 (1st Cir. 1993) (brothers).

The parties debate whether the immigration judge erred by focusing on the social group consisting of Catalina's immediate family rather than Gonzalez Ruano's immediate family. We do not see any practical difference. Both the immigration judge and the Board defined the social group as Catalina's immediate family. We see no reason to dispute this interpretation of the evidence. See *Escobar v. Holder*, 657 F.3d 537, 542 (7th Cir. 2011) ("Our duty at this stage is to uphold the Board's determination if it is supported by substantial

evidence [that is] . . . reasonable, substantial, and probative evidence on the record considered as a whole.").[1]

C. *Nexus Between Membership and Persecution*

The main issue on judicial review is whether the record compels a finding that Gonzalez Ruano showed a nexus between the persecution he experienced and his membership in his wife's immediate family. This is "a question of fact that we review for substantial evidence." *W.G.A.*, 900 F.3d at 965. Under this standard, we can reverse the immigration judge's finding "only if we determine that the evidence compels a different result." *Cece*, 733 F.3d at 675–76, quoting *FH-T v. Holder*, 723 F.3d 833, 838 (7th Cir. 2013).

To prove his eligibility for asylum, Gonzalez Ruano needed to show that the persecution he experienced by CJNG was "on account of" of his membership in a particular social group. 8 U.S.C. §§ 1101(a)(42)(A) & 1158(b)(1)(A)–(B)(i). "The

---

[1] We do not need to decide whether the second social group offered by Gonzalez Ruano—people who refused CJNG's orders—is a cognizable social group for purposes of asylum law. During oral argument, the government requested for the first time that we remand this case to the Board for further fact-finding on the scope of the social group based on the reasoning of *Matter of W-Y-C- & H-O-B-*, 27 I. & N. Dec. 189 (BIA 2018). Even if this request were timely, and it was not, we would decline to remand. Though *W-Y-C-* was decided after the Board's decision here, it did not establish a new rule or even clarify an existing one. See *W-Y-C- & H-O-B-*, 27 I. & N. Dec. at 191, quoting *Matter of A-T-*, 25 I. & N. Dec. 4, 10 (BIA 2009). Regardless, *W-Y-C-* is distinguishable from this case. In *W-Y-C-*, the respondent attempted to argue on appeal to the Board that she was a member of a social group that she did not propose to the immigration judge. By contrast, Gonzalez Ruano proposed these same groups before the immigration judge.

protected trait does not have to be the only reason for the per-
secution, but it 'cannot play a minor role.'" *W.G.A.*, 900 F.3d
at 965, quoting *Matter of L-E-A-*, 27 I. & N. Dec. 40, 44 (BIA
2017). Because the persecutors are members of the CJNG and
not the Mexican government, Gonzalez Ruano must also
show that the government would be unable or unwilling to
prevent the persecution by CJNG upon his return. *Cece*, 733
F.3d at 675.

Where the alleged persecution is because of membership
in a family group, "nexus is not established simply because a
particular social group of family members exists and the fam-
ily members experience harm." *L-E-A-*, 27 I. & N. Dec. at 45
(no nexus shown between attempted kidnapping and peti-
tioner's social group comprised of the family of his father; pe-
titioner was targeted for refusing to sell drugs from family
store, not for his social group); see also *Plaza-Ramirez v. Ses-
sions*, 908 F.3d 282, 286 (7th Cir. 2018) (no nexus shown be-
tween gang's attack on petitioner and his membership in his
family, including his gang-affiliated cousin; petitioner con-
ceded attack on him was based on mistaken identity). Gonza-
lez Ruano has put together a record of evidence that compels
a finding under this standard that the cartel persecuted him
and threatens to persecute him because of his membership in
a particular social group.

### 1. *Persecution or Personal Animosity?*

The immigration judge was correct in saying that, no mat-
ter how horrible Gonzalez Ruano's experiences were, the re-
quirements for asylum are not satisfied if the harm he suffered
was inflicted solely because of a private quarrel. *Duarte-
Salagosa v. Holder*, 775 F.3d 841, 846 (7th Cir. 2014).

Membership in the protected group "must be at least one central reason" for the persecution. 8 U.S.C. § 1158(b)(1)(B).

This case is similar to *W.G.A.*, where the petitioner sought asylum in the United States after receiving multiple death threats because his brother had defected from an influential Salvadoran gang. As in this case, the immigration judge found W.G.A. had not been persecuted on account of his membership in his family. We granted W.G.A.'s petition for review because the timing of the persecution, the statements made by the persecutors, and the circumstantial evidence corroborating the gang's motives compelled a finding that W.G.A. was persecuted because of his kinship ties. 900 F.3d at 966. We acknowledged that gang members may have been motivated in part by a personal vendetta against the petitioner, but we concluded that the evidence showed that any vendetta against W.G.A. stemmed from his relationship to his defecting brother. *Id.* at 967.[2]

Here, Gonzalez Ruano demonstrated that one central reason the CJNG persecuted him was "on account" of his membership in his immediate family. The evidence shows that, just as in *W.G.A.*, any arguably "personal" vendetta against

_____

[2] The government argues we should consider this case under *Plaza-Ramirez* rather than *W.G.A.* We are not persuaded. In *Plaza-Ramirez*, the petitioner was unable to establish a nexus to the proposed social group of his family, primarily because he conceded the one attack he suffered at the hands of a rival gang of his cousin was the result of a mistaken identity. 908 F.3d at 286. Additionally, after Plaza-Ramirez experienced this isolated attack, he remained in Mexico for another nine months, never filed a police report, and did not experience any further persecution. He did not apply for asylum until he had already spent more than a decade in the United States. *Id.* at 284. There was also no evidence that other family members had been threatened or harmed.

Gonzalez Ruano was due to his relationship with his wife, i.e., his membership in his wife's immediate family. Also as in *W.G.A*, the timing of the persecution and statements made by the persecutors leave no doubt that he was and remains a target because of his relationship with his wife.

The government urges us to agree with the immigration judge that these events were the result of a personal dispute between Gonzalez Ruano and Rivera over Catalina, as if this were the story of a love triangle. The testimony, expert report, news articles, and affidavits provided by Gonzalez Ruano's family show beyond reasonable dispute that the persecution here was not simply a matter of two men fighting over a woman. Instead, the record shows that what Gonzalez Ruano and his family experienced—sexual violence, attempts of forced recruiting, kidnapping, and harrowing death threats—is consistent with how CJNG terrorizes communities into submission. This view is further supported by the advice Gonzalez Ruano received from the Mexican attorneys he consulted and the prosecutor's warning that he could not protect him.

As best we can tell, no evidence supports the denial of Gonzalez Ruano's asylum application based on speculation that his torture *might* have been motivated by a cartel leader's personal "desire" for Catalina. Further, the record leaves no doubt that the Mexican government would be unable or unwilling to help Gonzalez Ruano avoid further persecution if he returned to Mexico. (Recall that it was a government official who advised him to flee in the first place.)

We also find support for our decision in a very similar decision by the Fourth Circuit. In *Hernandez-Avalos v. Lynch*, 784 F.3d 944 (4th Cir. 2015), a mother from El Salvador was threatened several times at gunpoint by members of a gang because

she refused to allow them to recruit her young son. Hernandez-Avalos fled to the United States with her son and applied for asylum, arguing that the persecution she experienced was due to her membership in her nuclear family. *Id.* at 949. The Board of Immigration Appeals rejected this argument, concluding instead that Hernandez-Avalos "was not threatened because of her relationship to her son (i.e. family), but rather because she would not consent to her son engaging in a criminal activity." *Id.* The Fourth Circuit granted Hernandez-Avalos's petition for review, finding the Board's determination to be "an excessively narrow reading of the requirement that persecution be undertaken on account of membership in a nuclear family." *Id.* at 949–50 (quotation marks omitted). The court went on to reason that "Hernandez's relationship to her son is why she, and not another person, was threatened with death if she did not allow him to join Mara 18, and the gang members' demands leveraged her maternal authority to control her son's activities." *Id.* at 950.

As in *Hernandez-Avalos*, the government argues here that the harm Gonzalez Ruano experienced resulted from Rivera's attempt to "possess" Catalina, and that the persecution was simply a "means to an end," making Gonzalez Ruano's relationship to his wife incidental. In other words, goes the argument, he was not persecuted because he is a member of Catalina's immediate family but because, as her husband, he was the one person preventing the CJNG from forcibly recruiting her. We confess that this argument—CJNG targeted Gonzalez Ruano because they wanted his wife, not because he is her husband—draws a finer distinction than we can discern. As in *Hernandez-Avalos*, Gonzalez Ruano's relationship to his wife was the reason he, and not someone else, was targeted.

After oral argument in this court, the government submitted a letter under Federal Rule of Appellate Procedure 28(j) with the Sixth Circuit's recent decision in *Cruz-Guzman v. Barr*, — F.3d —, 2019 WL 1224104 (6th Cir. 2019). Gonzalez Ruano has responded. In *Cruz-Guzman*, the immigration judge denied an asylum application because the petitioner failed to establish a nexus between his family and the persecution he faced in El Salvador. The case presents an issue quite different from this one, however. Cruz-Guzman fled to the United States after becoming entangled in the matters of two rival gangs. Sometime after leaving El Salvador, Cruz-Guzman's mother and younger sister also fled the country after they were targeted by gang members because the mother was not able to pay "protection money." *Id*. at *3. During his asylum hearing, Cruz-Guzman claimed that if he were returned to El Salvador, the gang would retaliate against him for his mother's inability to pay. The Board did not find this evidence satisfied the nexus requirement and the Sixth Circuit did not find the evidence compelled the opposite conclusion.

The government argues that we should apply the Sixth Circuit's approach in *Cruz-Guzman* to the nexus requirement here. In *Cruz-Guzman*, however, the petitioner's past persecution had nothing to do with his family membership. The court's opinion did not explain in detail the evidence of the mother's debt and the reason the petitioner feared he would be held accountable for that debt if he were returned. In this case, by contrast, as in *W.G.A.* and *Hernandez-Avalos*, the evidence linking the past persecution to family relationships is overwhelming. In fact, the evidence here shows that the CJNG was persecuting Gonzalez Ruano for the stated purpose of destroying Catalina's family. Gonzalez Ruano offered compelling evidence of the required nexus between his social group

and his persecution; no substantial evidence in the record supports a contrary finding.

   2. *Threats to Other Family Members*

Finally, we address the government's contention that Gonzalez Ruano should be denied asylum because no other members of his family were threatened or harmed by the CJNG. To downplay the obvious threats against Catalina's sons, the government actually argued that Rivera, by merely expressing knowledge of the children's names, did not threaten them. It's an interesting suggestion, but it overlooks the fact that Rivera was holding a gun to Gonzalez Ruano when he mentioned that he knew the boys' names. In the alternative, the Government argues the threat was actually against Gonzalez Ruano, not the boys themselves. We reject these astonishing arguments. They ask us to close our eyes to reality.

In any event, Gonzalez Ruano did not need to prove that the CJNG targeted other members of Catalina's family to establish that the cartel targeted him on account of his membership in her family. Threats to harm other members of the group can certainly be relevant, but they are not essential to such an asylum claim. See *W.G.A.*, 900 F.3d at 967 (finding it improper for immigration judge to deny asylum based on lack of harm to other family members); *R.R.D. v. Holder*, 746 F.3d 807, 809 (7th Cir. 2014) (asylum statute "does not require that all members of that category suffer the same fate").

In sum, Gonzalez Ruano's credible testimony established that he was persecuted by members of the CJNG and that the Mexican government was unable or unwilling to help him. Compelling evidence shows that Gonzalez Ruano's persecution was due to his status as Catalina's husband and thus as a

member of a social group comprised of her immediate family for purposes of § 1101(a)(42)(A). The immigration judge erred in finding that Gonzalez Ruano did not demonstrate a nexus between the persecution and his membership in a particular social group. He has established his eligibility for asylum.

We GRANT the petition for review and REMAND the case to the Board of Immigration Appeals for further proceedings consistent with this opinion.